RECEIVED
MAR 1 5 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM | : | DOCKET NO. 6:12-1609 |
| VS. | : | JUDGE TRIMBLE |
| LHC GROUP, INC., ET AL | : | MAGISTRATE JUDGE HILL |

MEMORANDUM RULING

Before the court is "Defendants' Motion to Dismiss Plaintiff's Amended Complaint" ( R. #31) wherein the mover seeks to dismiss the Amended Complaint ("AC") with prejudice pursuant to Rule 6(b) of the Federal Rules of Civil Procedure. Defendants assert that the AC lacks the substance and detail required by the Private Securities Litigation Reform Act (the "Act").

FACTUAL ALLEGATIONS

This matter is a class action lawsuit by purchasers of the publicly traded securities of LHC Group, Inc. ( "LHC")[1] for violations of the anti-fraud provisions of federal securities laws between July 30, 2008 and October 26, 2011 (the "Class Period"). Plaintiff, the City of Omaha Police and Fire Retirement System, purchased LHC common stock during the Class Period.[2] In their AC, plaintiff makes the following allegations.

LHC provides post-acute health care services to patients through its home nursing agencies,

---

[1] Sometimes referred to herein as the "Company".

[2] LHC's common stock traded under the symbol LHCG on the NASDAQ.

hospices, and long-term acute care hospitals.[3] Defendant, Keith G. Myers was at all relevant times, the CEO of LHC. During the Class Period, LHC revenues increased dramatically; defendants, LHC and Keith G. Myers[4] informed investors that the increase was due to "organic growth" and acquisitions.[5]

LHC provides home healthcare to Medicare patients. Prior to 2008, Medicare provided bonus payments when a home healthcare patient reached a 10 visit threshold. Medicare changed its threshold visits on January 1, 2008, and began paying bonuses at six, 14 and 20 visits. Shortly after the policy change, and also at the beginning of the Class Period, in an attempt to maximize revenues, LHC instructed its healthcare providers to meet the new thresholds regardless of patient need.[6] In other words, LHC provided therapy visits based on meeting bonus payment criteria rather than a patient's medical needs.

The year following the bonus level changes, the proportion of patients receiving six visits increased 126%. The proportion of patients receiving 14 visits increased 75%. The proportion of patients receiving 20 visits increased 189%. However, the proportion of patients receiving 10 visits– the old bonus threshold- declined 67%.[7] LHC informed investors that it was in full compliance with all applicable laws, touting the quality and comprehensiveness of its compliance department.[8] LHC

---

[3] Amended Complaint, R. #30, ¶ 2.

[4] LHC's Chief Executive Officer.

[5] Id.

[6] Id., at ¶ 4.

[7] Id.

[8] Id., at ¶ 5.

further claimed that its compliance program represented a competitive advantage.[9]

Prompted by a newspaper article, on May 12, 2010, the U.S. Senate Finance Committee began to investigate LHC's Medicare practices.[10] Consequently, within two days, LHC's stock price declined over 7%. LHC denied wrongdoing, claiming that "at LHC, patient decisions are made by the local care giver and the patient's physician – reimbursement is not a factor to be considered."

On July 13, 2010, LHC announced that the SEC had initiated an investigation of the same Medicare abuses prompted by the Senate Finance Committee.[11] LHC stock declined another 7%. LHC claims that it provided health care based only upon "patient needs" rather than financial incentives.[12]

On October 3, 2011, the Senate Finance Committee released a report (the "Senate Report") with respect to LHC and other companies in the industry. The Senate Report concluded that "the home health therapy practices identified . . . at best represent abuses of the Medicare home health program. At worst, they may be . . . defrauding the Medicare home health program at the expense of taxpayers."[13] The report found that, "[t]herapy metrics provided to the Committee by LHC Group point to a pattern of attempting to achieve the most profitable number of therapy visits. . . ." further noting "a centralized push from LHC Group management to increase the number of therapy visits

---

[9] Id.

[10] Id., at ¶ 6.

[11] Id., at ¶ 7.

[12] Id.

[13] Id. at ¶ 8.

performed."[14] The Senate Report cited to an email from defendant CEO Myers about the need to increase the number of therapy visits performed by LHC in order to meet bonus thresholds.

The Senate Report also remarked that even though LHC claimed that patient decisions were made by the local care giver and the patient physicians, and that reimbursement was not a considered factor, the investigation revealed that therapists and branch managers at LHC were pressured by supervisors to achieve a higher number of therapy visits. The price of LHC stock dropped 12% within two days after the Senate Report was disclosed.[15] Plaintiff asserts that the decrease in price was a result of the artificial inflation caused by defendants' various misleading statements.

Plaintiff complains that defendants violated the terms of the Social Security Act by defrauding Medicare and taxpayers alike; plaintiff asserts that after the bonus thresholds were changed, the proportion of patients visited six, 14 or 20 times increased as much as 189%. Plaintiff asserts that LHC's stock decline resulted because of artificial inflation caused by defendants' misleading statements. Plaintiff asserts that LHC's statements were false and misleading because they failed to disclose that LHC was defrauding Medicare and manipulating the number of patient visits to maximize revenue, regardless of patient need. For example, LHC repeatedly stated that it attributed its increased growth to "organic growth", when in truth the increased growth resulted in significant part from LHC's abuse of the Medicare system while touting its compliance with all applicable laws. Hence, LHC's statements were false and misleading because it knew that it was violating the Social Security Act by systematically providing unneeded medical care.

---

[14] Id. ¶ 9.

[15] Id., ¶ 11.

## RULE 12(B) (6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint when it fails to state a claim upon which relief can be granted. The test for determining the sufficiency of a complaint under Rule 12(b)(6) is that " 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' "[16] Subsumed within the rigorous standard of the Conley test is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged.[17] The plaintiff's complaint is to be construed in a light most favorable to plaintiff, and the allegations contained therein are to be taken as true.[18] In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.[19] "In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . ."[20] "Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[21] "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an

---

[16] Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977)(per curiam) citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, (1957)).

[17] Elliot v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989).

[18] Oppenheimer v. Prudential Securities, Inc., 94 F.3d 189, 194 (5th Cir. 1996).

[19] Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1137 (5th Cir. 1992).

[20] Guidry v. Bank of LaPlace, 954 F.2d 278, 281 (5th Cir. 1992).

[21] Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

inference fairly may be drawn that evidence on these material points will be introduced at trial."[22]

Under Rule 8 of the Federal Rules of civil Procedure, the pleading standard does not require a complaint to contain "detailed factual allegations," but it demands "more than an unadorned, the defendant-unlawfully-harmed-me accusation."[23] A complaint that offers "labels and conclusions:" or "a formulaic recitation of the elements of a cause of action will not do."[24] Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."[25]

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."[26]

## LAW AND ANALYSIS

Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations. Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." [27] Commission Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the

---

[22] Campbell v. City of San Antonio, 43 F.3d 973, 975 (5th Cir. 1995).

[23] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007).

[24] Id.

[25] Id., at 557, 127 S.Ct. 1955.

[26] Id., at 570, 127 S.Ct. 1955.

[27] 15 U.S.C. § 78j(b).

statements made ... not misleading."[28]

Under the act, a plaintiff must prove the following elements: (1) a material misrepresentation (or omission), (2) scienter, i.e. a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance or "transaction causation", (5) economic loss, and (6) loss causation, i.e. a causal connection between the material misrepresentation and the loss.[29] Defendants challenge the allegations of misrepresentation, scienter and loss causation.

*Misrepresentation or omission of material fact*

Defendants maintain that the complaint fails to specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.[30] Defendants complain that the majority of the AC is devoted to block quotes taken directly from press releases, S.E.C. filings, and earnings call transcripts for LHC's quarterly and year-end earnings releases, but fails to meet the requirements necessary to specify which particular statements were allegedly false or misleading.

Plaintiff points to statements made by defendants to investors that LHC's growth in home health care revenue was due to "organic growth" and "acquisitions." Plaintiffs assert that this is a false statement because the increased revenue growth was not from organic growth and/or acquisitions, rather it resulted in significant part from LHC's abuse of the Medicare system.

Furthermore, defendants repeatedly told investors that "we are in material compliance with applicable laws," as it touted LHC's compliance program and claimed that compliance represented

---

[28] 17 CFR § 240.10b-5 (2004).

[29] Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627 (2005)(citations omitted).

[30] 15 U.S.C. § 78u-4(b)(1).

a "competitive advantage" for LHC. The AC alleges that these were false and misleading because defendants knowingly violated the Social Security Act by systematically providing unneeded medical care. Plaintiff also asserts that defendants assured investors that "at LHC, patient decisions are made by the local care giver and the patient's physician – reimbursement is not a factor to be considered,"[31] and its systems "allocated adequate resources throughout the group of patients assigned to his or her care, rather than focusing on the profitability of an individual patient."[32] The AC alleges that these statements were "materially false and misleading because they failed to disclose that LHC was defrauding Medicare and manipulating the number of patient visits to maximize revenue, regardless of patient need."[33] Plaintiff remarks that the Senate Finance Committee also concluded that LHC's claim that reimbursement was not a factor was belied by internal company documents.[34]

Based on the foregoing, plaintiff maintains that the AC clearly specifies statements contended to be fraudulent, identifies the speaker, states when and where the statements were made and explains why the statements were fraudulent. As to why the statements were fraudulent or misleading, plaintiffs argue that defendants were knowingly violating the Social Security Act by systematically providing unneeded medical care while boasting of their compliance policies and procedures, and claiming they were in compliance with all applicable laws.

The court finds that the AC sufficiently alleges an actionable misrepresentation or omission of material fact.

---

[31] AC, ¶ 53. R. #30.

[32] Id. ¶¶ 54, 58.

[33] Id. ¶ 75.

[34] Id. ¶ 79.

*Scienter*

Defendants maintain that the AC fails to allege particularized facts that give rise to a strong inference that LHC or Mr. Meyers acted with the intent to deceive, manipulate, or defraud, or acted with severe recklessness in making statements or omissions.[35] Defendants complain that the AC only makes conclusory allegations regarding defendant's scienter because there is no attempt to link the alleged misstatement with the bases for inferring scienter and show what the defendants knew or were reckless in not knowing.

Section 10(b) and Rule 10b-5 require proof that the defendant acted with "scienter"– i.e., an intention to deceive, manipulate, or defraud.[36] The plaintiff must show either intent or severe recklessness.[37] "Severe recklessness" is not mere negligence, but is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure form the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Plaintiffs argue that the Senate Report demonstrates that Mr. Myers not only knew about the improper manipulation of home health visits but that he personally encouraged it. Specifically, the Senate Report quoted emails by Mr. Myers to a sales manager requesting that LHC increase patient visits so the company could receive additional bonuses from Medicare. The Senate Finance Committee concluded that such practices, "at best represent abuses of the Medicare home health

---

[35] Citing *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009).

[36] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504-2505 (2007).

[37] *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 407 (5th Cir. 2001).

program. At worst, they may be examples of . . . defrauding the Medicare home health program at the expense of taxpayers."[38] Plaintiff further argues that because of the vast importance of Medicare to LHC's business, there is a strong inference that Myers was aware that the company was inflating its reported financial results through abusive practices.[39] Plaintiff asserts that Mr. Myers repeatedly signed certifications attesting that he personally reviewed and evaluated LHC's internal controls and that signing such certifications supports a strong inference of scienter "' if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.'"[40] Plaintiff refers to a conference call including LHC's Group President and Chief Operating Officer urging employees to manipulate the home visits to meet bonus thresholds which was referred to by the Senate Report as a "centralized push from LHC Group management to increase the number of therapy visits performed.[41]

Plaintiff asserts that the AC alleges that Mr. Myers had a motivation for making the false and/or misleading statements; the AC alleges that Myers sold over $20 million of his personal

---

[38] AC, ¶ 76, R. #30.

[39] Citing Nathenson v. Zonagen, Inc., 267 F.3d 400, 425 (5th Cir. 2001)(strong inference of scienter as to cmpany CEO where statement related to business that "was obviously important" to the company). See also Makor Issues 7 Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 709 (7th Cir. 2008); Aldridge v. A.T.Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002); In re RAIT Fin Trust Sec. Litig., 2:07-3148 2008 WL 5378164 at *13 (E.D. Pa. Dec 22, 2008).

[40] Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007).

[41] AC, ¶ 79, R. #30.

holdings of LHC stock during the Class Period at fraudulently inflated prices.[42] Plaintiff argues that insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts.[43]

The AC adequately alleges that LHC and Mr. Myers knew about LHC's misconduct while at the same time touting LHC's compliance with Medicare law. Considering all of the facts alleged and taken collectively, the court finds that plaintiff's AC gives rise to a strong plausible inference of scienter.

*Loss Causation*

Defendants maintain that the AC fails to plead loss causation adequately. In a shareholder action based on federal securities laws, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."[44] In other words, plaintiff has to show that a misrepresentation caused its economic loss which "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss."[45] Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the AC to provide the defendants with fair notice of what the plaintiff's claim is and the grounds upon which it rests. Thus, plaintiff's AC must provide defendants with notice of the relevant economic loss and the causal connection between that loss and the misrepresentation.

---

[42] Id., ¶ 102.

[43] Citing Cent Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007).

[44] 15 U.S.C. § 78u-4(b)(4).

[45] Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2186 (2011).

Loss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed.[46] The two methods of disclosure generally recognized by courts are "corrective disclosure" and "materialization of the risk."[47] To avoid dismissal, a plaintiff must adequately allege that a "corrective disclosure" of a previously concealed truth caused a decline in the stock's price.[48] The corrective disclosure must at a minimum[49] identify which prior representation is called into question.[50] Thus, the AC must allege that the market reacted negatively to a corrective disclosure which revealed that LHC's prior representations were false.

The AC alleges that the company's stock price fell in response to announcements of an investigation by the SFC and the SEC made on May 12, 2010 and July 13, 2010. Plaintiffs rely on these announcement as corrective disclosures. Defendants remark that these exact same announcements were found to be insufficient as corrective disclosures in In re Almost Family, Inc.,[51] and Bach v. Amedisys.[52] Defendants argue that these disclosures revealed nothing more than a risk or a possibility that defendants may have made misrepresentations. Defendants note that other courts have concluded that an announcement regarding the start of a government investigation does not

---

[46] Ackerman v. Oryx Communications, Inc., 810 F.2d 336, 342 (2d Cir. 1987).

[47] In re Dell Inc., Securities Litigation, 591 F.Supp.2d 877 (W.D.Tex., 2008).

[48] Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981).

[49] In re Dell, 591 F.Supp.2d at 910.

[50] In re Odyssey Healthcare, Inc. S.E.C. Litig.,Inc., 504 F.Supp.2d 880, n.4 (N.D.Tex.2005).

[51] Docket No. :10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012).

[52] Docket No. 10-cv-395, slip op. (ECF No. 203)(M.D. La. June 28, 2012).

amount to a corrective disclosure.[53] Defendants maintain that the AC fails to allege that these announcements revealed the truth of any prior alleged misrepresentation by the Company.

Plaintiff asserts that there are a number of sources by which the market may learn of possible fraud such as whistle blowers, analysts' questioning financial results, resignations of CFOs or auditors, etc.[54]

The AC alleges that on October 23, 2011, the Senate Financing Committee issued the Senate Report concerning LHC and its competitors; the Report concluded that "[t]he home health therapy practices identified . . . at best represent abuses of the Medicare home health program. At worst, they may be . . . defrauding the Medicare home health program at the expense of taxpayers."[55] Within two days, the price of LHC's stock fell 12%.[56] Thus, plaintiff asserts that during the Class Period defendants concealed that LHC was abusing and defrauding Medicare. When the truth was revealed, LHC stock immediately plummeted. Plaintiff argues that this establishes causation by (1) defendants' "knowing omission" of material facts, (2) the disclosure of "relevant or related truth regarding" those facts, and (3) a "consequent significant drop" in the relevant stock.

Plaintiff further maintains that the Senate Report revealed two frauds: (1) LHC's fraud and abuse of Medicare, and (2) LHC had misled investors by telling them it was in compliance with all

---

[53] Citing In re Avista Corp. S.E.C. Litig., 415 F.Supp.2d 1214, 1220-21 (E.D. Wash. 2005)(the "[d]isclosure of an investigation, whether conducted internally or by the S.E.C. absent a revelation of prior misrepresentations [will not] constitute a corrective disclosure for purposes of loss causation.")

[54] Citing In re Enron Corp. S.E.C., Deriv. & "ERISA" Litig., 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)(cited by Lormand v. US Unwired, Inc., 565 F.3d 228 (5th Cir. 2009).

[55] R. #30, AC, ¶ 8.

[56] Id. ¶ 11.

applicable laws, that LHC's growth was due to organic factors and acquisitions, and that LHC provided care solely based upon medical need. Plaintiff asserts that the Senate Report included evidence that these statements were false. The Report cited statistics which revealed that LHC increased visits at 6, 14, and 20 days when the bonuses were changed to those levels.[57] The Report included emails from several Company executives showing that the change in treatment patterns was the result of a conscious, deliberate campaign by Mr. Myers and other LHC executives to maximize Medicare revenue regardless of patient need.[58]

Plaintiff argues that the Amedysis and Almost Family cases are distinguishable because those cases did not involve the Senate Report. The class period in Amedysis ended on September 28, 2010 over a year prior to the Senate Report being issued and the class period in Almost Family ended in July of 2010, also over a year before the Senate Report was issued. Thus, those opinions are not applicable because the Senate Report was not relied upon by the parties.

In addition to the Senate Report, plaintiff further relies upon the disclosure of the Senate investigation announcement on May 12, 2010 immediately followed by a 7% decline in LHC stock. Plaintiff argues that under Fifth Circuit precedent, the announcement of the Senate's investigation constitutes a corrective disclosure for causation purposes. Plaintiff relies on Alaska Elec. Pension Fund v. Flowserve Corp.,[59] which held that "'[t]o be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation.'" To establish loss causation, disclosed information must

---

[57] R. #30, ¶ 77.

[58] Id. ¶¶ 77-79.

[59] 572 F.3d 221, 230 (5th Cir. 2009).

14

reflect part of the "relevant truth"– the truth obscured by the fraudulent statements.[60]

Based on this analysis, the court finds that the AC adequately alleges a corrective disclosure with respect to LHC and properly pleads loss causation.

*Non-actionable allegations of mismanagement*

Defendants maintain that allegations of mismanagement do not state a viable claim for securities fraud.[61] Defendants complain that the AC focuses on how LHC managed its patient mix so that it could maintain profitability based on the new Medicare regulations. Defendants argue that negligence in how a company runs its business does not bring the claims within the scope of Rule 10(b), and thus they are barred by the Santa Fe doctrine because they allege nothing more than general corporate mismanagement which does not constitute fraud.

Plaintiff argues that the gravamen of its claims is that defendants misled investors about the way LHC ran its business. Defendants told investors that LHC complied with all applicable laws, that its increase in home health revenue was caused by organic growth and acquisitions, and that all treatment decisions were made solely on the basis of medical need. Plaintiff alleges in the AC that all of these statements were false and misled investors about LHC's business, consequently, a violation of the federal securities laws.[62]

The court finds that the allegations in the AC are more than allegations of mismanagement

---

[60] Id.

[61] Santa Fe Indus, Inc. v. Green, 430 U.S. 462, 480 (1977).

[62] Citing In Re Atlas Air Worldwide Holding, In S.E.C. Litig., 324 F. Supp.2d 474, 494 n.11 (S.D.N.Y. 2004)("Although 'poor business judgment is not actionable under' federal securities laws, a plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false statements. . .")

15

and therefore are actionable.

*Section 20A Claim against Keith Myers*

Defendants maintain that because the AC fails to state an independent claim for violation of the Exchange Act, there can be no liability under Section 20A.[63] Plaintiff maintains that such a violation has been properly alleged. The AC alleges that Mr. Myers knew throughout the Class Period that LHC was engaged in a massive scheme to defraud and abuse the Medicare system, and that at the time he sold his stock, he was in possession of material, adverse, non-public information in violation of Section 20A. The court finds that plaintiff has properly alleged a section 20A claim against defendant, Keith Myers.

## CONCLUSION

For the reasons set forth above, the motion to dismiss will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 15th day of March, 2013.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

---

[63] Citing In re Enron Corp. §., Derivative & ERISA Lit., 258 F.Supp.2d 576, 599 (S.D. Tex. 2003)(citing 15 U.S.C. § 78t-l(a)) and In re VeriFone S.E.C. Litig., 11 F.3d 865, 872 (9th Cir. 1993).