UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CITY OF OMAHA POLICE AND FIRE
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similarly Situated,

                              Plaintiff,

    - against-

LHC GROUP, INC. AND KEITH G.
MYERS,

                              Defendants.

Case No. 6:12-CV-01609-JTT-CMH


**DECLARATION OF DEBORAH CLARK-WEINTRAUB IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; AND (2) AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, DEBORAH CLARK-WEINTRAUB, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of New York, and I have been admitted in this case *pro hac vice*.  I am a member of the law firm of Scott+Scott, Attorneys at Law, LLP ("Scott+Scott" or "Lead Counsel"), counsel for Lead Plaintiff City of Omaha Police and Fire Retirement System ("Lead Plaintiff" or "Omaha Police and Fire") and the Class.[1]  I have been actively involved in prosecuting and resolving this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon actively supervising and participating in all material aspects of the above-captioned action (the "Action").

2.      I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for: (a) final approval of the Stipulation, which provides for a cash settlement of $7,850,000, and the Plan of Allocation of settlement proceeds; and (b) Lead Counsel's application for attorneys' fees and expenses.

## I.      PRELIMINARY STATEMENT

3.      After nearly two years of litigation, extensive motion practice, discovery, and vigorous arm's-length negotiation with the assistance of a distinguished private mediator, Hon. Layn R. Phillips (Ret.) ("Judge Phillips"), Lead Plaintiff has achieved a substantial and valuable Settlement of this Action, which this Court preliminarily approved on August 1, 2014 in its Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order").  ECF No. 76.  For the reasons set forth below, Lead Counsel believes that final approval of the Settlement and Plan of Allocation is warranted and that the application for an award of attorneys' fees and expenses should be granted.

---

[1]      Unless otherwise defined herein, all capitalized terms shall have the same meaning as set forth in the Stipulation of Settlement dated June 16, 2014 ("Stipulation").

4.      This case has been vigorously litigated from the outset.  The Settlement was achieved only after Lead Counsel, *inter alia*: (a) conducted a detailed investigation of potential claims against LHC Group, Inc. ("LHC" or the "Company") and Individual Defendant Keith G. Myers ("Myers") that resulted in the filing of the original complaint; (b) moved, pursuant to the PSLRA and on behalf of the Omaha Police and Fire, for appointment of Lead Plaintiff and Lead Counsel; (c) oversaw detailed investigative interviews of numerous confidential witnesses, including former employees of LHC; (d) prepared a detailed amended complaint; (e) successfully opposed Defendants' comprehensive motion to dismiss; (f) successfully opposed Defendants' attempt to seek interlocutory appeal of the Court's decision on the motion to dismiss; (g) drafted Freedom of Information Act ("FOIA") requests to the Securities and Exchange Commission ("SEC") and the Office of Inspector General, Department of Health and Human Services ("OIG HHS"); (h) received and reviewed over 137,000 pages of documents produced by Defendants and the SEC; (i) prepared the initial disclosures required by Fed. R. Civ. P. 26; (j) drafted comprehensive requests for production of documents to Defendants; (k) responded to Defendants' requests for production and interrogatories; (l) engaged in multiple meet-and-confer teleconferences regarding the scope of discovery; (m) consulted extensively with experts and consultants in the fields of economics and damages; and (n) prepared two detailed mediation briefs, attended a full-day mediation, and had numerous follow-up communications with the mediator regarding settlement of the Action.  The efforts that were required to complete these tasks were extensive and represented an immense risk given the contingency-based nature of Lead Counsel's representation.

5.      In view of the foregoing, there is no question that the Settlement is the result of negotiations by counsel who possessed a full understanding of both the strengths and weaknesses

of their respective cases and takes into consideration the significant risks specific to this Action. When balanced against the significant risks Lead Plaintiff faced in bringing the Action to trial and defending a favorable verdict against appeals, the Settlement of $7,850,000 plus interest represents an excellent result for the Class, especially considering the circumstances of this case as discussed herein.  Investigation, discovery, motion practice, and legal research informed Lead Counsel that, while they believed the case was meritorious, there were also weaknesses that had to be carefully evaluated in determining what course of action was in the best interests of the Class (*i.e.,* whether to settle and on what terms, or to continue to litigate through, potentially, class certification, summary judgment, and a trial on the merits).  As set forth in further detail below, despite the fact that Lead Plaintiff's allegations and claims were supported by legal authority, expert opinion, and evidence discovered during extensive pre-trial investigation and discovery, the specific circumstances involved here presented uncertainties with respect to Lead Plaintiff's ability to prevail through class certification, summary judgment, and trial, and, even in the event of success at trial, to defend a successful verdict against appeal.

6.    Further evidence that the Settlement represents an excellent result for the Class is the fact that, as of the filing of this Declaration, zero Class Members have contacted Lead Counsel to object to the Settlement or to opt out of the Settlement Class.

7.    Likewise, the Plan of Allocation of Settlement proceeds, which was developed with the assistance of Lead Plaintiff's expert consultant on loss causation and damages, should be approved as it equitably distributes the proceeds of the Settlement among Class Members by taking into account the timing of Class Members' purchases and sales (if any) of LHC common stock during the Class Period.  Again, no objections to the Plan of Allocation have been filed.

8.      Finally, the requested attorneys' fees of 33-1/3% of the Settlement Fund and expenses in the amount of $163,228.52 are reasonable and appropriate.  This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits that Lead Counsel conferred on the Class, the risks they undertook, the quality of their representation, the nature and extent of their legal services, and the fact that they pursued the case, even though this considerable all-cash Settlement was far from guaranteed at its outset.  Plaintiff's Counsel have expended considerable time and effort prosecuting the Action on a fully contingent basis and have advanced litigation, expert, and investigative expenses in the expectation that, as is customary, they will be paid a percentage of the common fund created by their efforts as their attorneys' fees and receive payment of their expenses.  As with the Settlement, no Class Member has objected to Plaintiff's Counsel's request for fees and expenses.

9.      Because this Declaration is submitted in support of a Settlement, it is inadmissible in any subsequent proceedings, other than in connection with the Settlement.  In the event the Settlement is not approved by the Court, this Declaration and the statements contained herein are without prejudice to Lead Plaintiff's position on the merits of this Action.

10.      The following is a summary of the nature of the Class's claims, the principal events that occurred during the course of the litigation, and the legal services that Lead Counsel provided.

## II.      FACTUAL BACKGROUND

### A.      Summary of Lead Plaintiff's Claims

11.      This securities fraud class action has been brought on behalf of investors who purchased or acquired LHC common stock between July 30, 2008 and October 26, 2011, inclusive, against LHC and its CEO, Defendant Myers.

12.      LHC is a home health care company that specializes in providing home health care services to its patients.  As explained in the Amended Complaint for Violations of the Federal Securities Laws (the "AC"), Medicare pays home health care providers such as LHC for each home visit, with bonuses when certain thresholds are met.  Prior to 2008, Medicare paid a bonus to companies like LHC after ten visits to a home health care patient.  At the beginning of the Class Period, however, Medicare changed its bonus policy and began paying bonuses at intervals of 6, 14, and 20 visits.

13.      Lead Plaintiff alleged that, while LHC emphasized that its increased revenues were due to "organic growth" and success in its acquisitions, the Company's increased revenues were actually the result of LHC instructing its health care providers to meet the new 6, 14, and 20 visit thresholds regardless of the medical necessity of such visits.  As a result, one year after the changes to the bonus criteria, the proportion of LHC's patients receiving 6, 14, and 20 visits increased 126%, 75%, and 189%, respectively.  Concurrently, the proportion of patients receiving 10 visits – the old bonus threshold – declined 67% in 2008.  This alleged manipulation of patient care for financial gain was a violation of the Social Security Act, which states that home health care shall be provided to Medicare beneficiaries only when it is medically necessary.

14.     Lead Plaintiff further alleged that while Defendants were engaged in this improper scheme, they were simultaneously misleading investors about the reasons for the Company's growing revenues and its compliance with applicable laws.  As detailed in the AC, Defendants: (a) attributed the growth in LHC's home health care revenues solely to "organic growth" and acquisitions; (b) told investors that they believed LHC was "in compliance with all applicable laws;" (c) touted the quality and comprehensiveness of LHC's compliance department and referred to it as a competitive strength over its competitors; and (d) definitively asserted that "patient decisions are made by the local caregiver and the patient's physicians – reimbursement is not a factor to be considered."  The AC contended that none of these assertions were true and the Company's improved results were driven by abusive Medicare tactics.  The AC alleged that the price of LHC common stock was inflated as a result of the true nature of LHC's business being misrepresented.

15.     Lead Plaintiff further alleged that, while the price of LHC securities was inflated, Myers sold much of his personal LHC stockholdings to collect over $20 million in proceeds.

16.     The AC alleged that the truth regarding LHC's practices began to be revealed upon the publication of a *Wall Street Journal* analysis of home health care therapy utilization patterns at LHC and its competitors.  This analysis suggested that the companies were gaming the Medicare therapy payment system by providing medically unnecessary visits in order to meet the bonus thresholds.  The analysis demonstrated that the percentage of LHC's patients getting ten visits dropped by 64% following the implementation of the new bonus thresholds.

17.     The *Wall Street Journal*'s analysis prompted the Senate Finance Committee ("SFC") to open an official investigation into LHC's practices, along with the practices of LHC's competitors Amedisys, Gentiva, and Almost Family.  The AC alleged that the disclosure of the

SFC investigation on May 12, 2010 caused LHC's stock price to decline 7% over the next two days.

18.     Similarly, the AC alleged that the disclosure of an investigation of LHC by the SEC announced on July 13, 2010 caused another 7% decline in the price of LHC stock.

19.     After conducting its investigation, on October 3, 2011, the SFC released a report analyzing the home therapy practices of LHC and its competitors.  The report characterized LHC's practices as "at best," an "abuse" of the Medicare home health program, and "[a]t worst," an example of a for-profit company "defrauding the Medicare home health program at the expense of taxpayers," and noted that the Company's documents had revealed "a centralized push from LHC Group management to increase the number of therapy visits performed."  As support, the report cited numerous internal LHC emails that have been produced to the SFC.

20.     After the publication of the SFC's report, the Company's stock price suffered an approximately 12% decline.

21.     Then, after the close of the market on October 26, 2011, LHC announced disappointing preliminary results for the third quarter of 2011 and reduced its earnings and revenue guidance for fiscal 2011 resulting in a further 15% decline in the Company's stock price. The announcement attributed the disappointing results to, *inter alia*, less-than-expected operating performance, which Lead Plaintiff alleged resulted from disclosure and cessation of the abusive Medicare practices.

## III.     PROCEDURAL HISTORY

### A.     Initial Complaint and Lead Plaintiff Appointment Process

22.     On June 13, 2012, Omaha Police and Fire filed the first securities class action against Defendants in this Court.  ECF No. 1.  Scott+Scott has represented Omaha Police and

Fire since at least 2009 and in this litigation since its inception.  The original complaint was based on a review and analysis of voluminous publicly available information concerning LHC and its business practices, including the Company's SEC filings, analyst reports, newspaper and other media articles, and the report of the SFC and exhibits thereto.  On August 13, 2012, Omaha Police and Fire moved for appointment as Lead Plaintiff and further moved the Court to appoint Scott+Scott as Lead Counsel and the Lemmon Law Firm as Liaison Counsel.  ECF No. 13.  No other fund, party, or interested Class Member moved for appointment of lead plaintiff in this matter.  On September 18, 2012, the Court granted the motion.  ECF No. 29.

23.     After the leadership appointment, Lead Counsel retained an investigator to uncover additional factual support for Lead Plaintiff's claims.  The use of investigators to gather detailed, fact-specific information from knowledgeable witnesses is often necessary in drafting the type of highly particularized complaints mandated by the pleading standards of the Private Securities Law Reform Act of 1995 ("PSLRA").  The tasks performed by the investigators, at the direction of Lead Counsel, included, *inter alia,* identifying, locating, and interviewing former LHC employees and other potentially knowledgeable witnesses.  Through this investigation, Lead Plaintiff identified four former LHC employees who had knowledge corroborating the allegations made in the initial complaint, and the information they provided was incorporated into the AC.

**B.     Amended Complaint and Defendants' Motion to Dismiss**

24.     On November 2, 2012, Lead Plaintiff filed its AC.  ECF No. 30.  The AC asserted claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder against LHC and Myers and a claim for insider trading in violation of §20A of the Exchange Act against Defendant Myers.   The AC alleged, *inter alia*, that Defendants made false and

8

misleading statements and concealed material facts regarding the source of LHC's increased revenues, the strength of LHC's compliance program, and whether Medicare reimbursement played a factor in patient decisions.  It also alleged that Defendant Myers profited from LHC's artificially inflated share price by selling approximately 650,000 LHC shares that he owned for aggregate proceeds of nearly $20,000,000.

25.     On December 17, 2012, Defendants filed their motion to dismiss.  ECF No. 31. The complex memorandum of law accompanying this motion cited dozens of cases and raised numerous legal issues and sub-issues aimed at undermining Lead Plaintiff's claims and allegations.  The Defendants argued that the AC: (a) failed to allege any false or misleading statements or omissions of material fact; (b) failed to adequately allege a strong inference of scienter; (c) failed to adequately plead facts supporting a finding of loss causation; and (d) only contained non-actionable allegations of mismanagement.

26.     Defendants' motion relied heavily on two decisions in securities fraud class action cases brought against two of LHC's competitors following the publication of the *Wall Street Journal* article, which were both dismissed for failure to plead a corrective disclosure (*i.e.,* loss causation).  In both of these cases (*Bach v. Amedisys*, *Inc.*, No. 10-395-BAJ-CN, ECF No. 203 (M.D. La. June 28, 2012) and *In re Almost Family Inc. Sec. Litig.,* No. 3:10-cv-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)), the courts held that announcements of government investigations standing alone do not constitute corrective disclosures unless they reveal actual fraud and that the disclosures cited in those cases did not reveal actual fraud on the part of the companies at issue.[2]  Defendants argued that the reasoning of these decisions was equally

---

[2]     The district court's dismissal of the *Amedisys* case was recently reversed by the Fifth Circuit.  *See Public Employees' Retirement Sys. of Mississippi v. Amedisys Inc.*, No. 13-30580, 2014 WL 4931411 (5th Cir. Oct. 2, 2014).

applicable to this Action and, therefore, the Court could not find that a corrective disclosure had been alleged in this Action.  In that regard, Defendants argued that the press reports of the governmental investigation cited in the AC and the SFC Report itself "did not reveal any actual fraud," and instead merely revealed the possibility that a fraud had occurred.

27.     On January 31, 2013, Lead Counsel filed an opposition to Defendants' motion. ECF No. 34.  Lead Counsel's comprehensive and thoroughly researched brief in support of Lead Plaintiff's opposition argued that each of Defendants' arguments to dismiss the AC should be rejected.  Lead Plaintiff argued, *inter alia,* that: (a) Defendants' statements that LHC's increased revenues were the result of organic growth and acquisitions were materially false and misleading; (b) the SFC Report contained evidence, including internal Company emails, demonstrating the falsity of LHC's statements; (c) the AC alleged facts that raised a strong inference of scienter by incorporating the materials cited by the SFC; and (d) the AC alleged facts supporting a showing of loss causation.

28.     On March 4, 2013, Defendants filed their reply brief in support of their motion to dismiss responding to Lead Plaintiff's arguments in opposition.  ECF No. 35.

**C.     The Court's Order Denying the Motion to Dismiss**

29.     On March 15, 2013, the Court issued a memorandum opinion and order denying the Defendants' motion to dismiss in full.  ECF No. 37.  The Court found that: (a) Lead Plaintiff's allegations of falsity were sufficient to withstand a motion to dismiss; (b) the AC gave rise to a strong inference of scienter; and (c) the AC sufficiently alleged loss causation.

30.     In denying the Defendants' motion, the Court rejected Defendants' argument that the AC did not adequately identify the alleged material misstatements and omissions and alleged nothing more than mismanagement.  The Court also found that the facts alleged in the AC gave

rise to "a strong plausible inference" of Defendants' scienter, citing the findings contained in the SFC Report and Defendant Myers' suspiciously timed insider sales.

31.     The Court also rejected Defendants' arguments that Lead Plaintiff's allegations of loss causation were inadequate because the corrective disclosures "revealed nothing more than a risk or a possibility that defendants may have made misrepresentations."  The Court observed that, under controlling Fifth Circuit authority, "[t]o be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation" and that loss causation is established when the "disclosed information… reflect[s] part of the 'relevant truth' – the truth obscured by the fraudulent statements."  In this regard, the Court noted that the SFC Report included evidence that that Defendants' statements that LHC's growth was due to organic factors and acquisitions, and that LHC provided care solely based upon medical need, were false, including "emails from several Company executives showing that the change in treatment patterns was the result of a conscious, deliberate campaign by Mr. Myers and other LHC executives to maximize Medicare revenue regardless of patient need."  In addition, the Court observed that the price of LHC common stock declined following the alleged corrective disclosures.  In view of the foregoing, the Court found that the AC "adequately allege[d] a corrective disclosure with respect to LHC and properly pleads loss causation."

32.     Defendants answered the AC on April 15, 2013.  ECF No. 42.  Defendants substantially denied the AC's allegations and raised 45 different affirmative defenses.

**D.      Defendants' Request for Interlocutory Appeal**

33.     After the Court rejected all of the Defendants' arguments in favor of dismissal, on April 12, 2013, Defendants filed a motion to amend the Court's order on the motion to dismiss to allow them to seek interlocutory appeal of the order.  ECF No. 41.  Defendants' motion argued

that the Court's finding that loss causation had been adequately alleged was contrary to Fifth Circuit law.  In support of their argument that interlocutory review was justified, Defendants also pointed to the conflicting opinions on the issue of whether loss causation had been adequately alleged in three securities class action cases that had been filed against LHC's competitors also named in the SFC Report.  Defendants also sought a stay of proceedings while the Fifth Circuit decided the appeal.  In seeking to combat Defendants' attempt to obtain a stay, on April 26, 2014, Lead Plaintiff filed a motion to compel Defendants' participation in a Rule 26(f) discovery conference, which was denied.  ECF No. 46.  Thereafter, on May 3, 2013, Lead Plaintiff filed its opposition to Defendants' motion to amend the motion to dismiss order and for a stay.  ECF No. 48.  On May 23, 2014, the Court granted the motion which allowed Defendants to seek interlocutory review, stating that "the issue of corrective disclosures is a controlling question of law as to which there is substantial ground for differences of opinion, and that an immediate appeal from the judgment may materially advance the ultimate termination of the litigation." ECF No. 56.

34.    Defendants filed their opening appellate brief with the United States Court of Appeals for the Fifth Circuit on June 4, 2013 (Case No. 13-90033) rearguing all of the points regarding loss causation that they had argued below.  Lead Plaintiff filed its opposition to Defendants' request for appeal on June 17, 2013, arguing that interlocutory appeal was inappropriate because Defendants had not identified: (a) a controlling question of law; (b) on which there were substantial grounds for difference of opinion; and (c) where the immediate appeal may materially advance the ultimate termination of the litigation.  Further, Lead Plaintiff argued that the decision below was consistent with well-settled Fifth Circuit precedent with respect to pleading loss causation and, therefore, Defendants had not set forth an adequate reason

to depart from the usual rule that appellate review must wait until a final judgment.  On July 18, 2013, the Fifth Circuit issued an order declining to take Defendants' interlocutory appeal.

### E.    Fact Discovery

35.    After Defendants' request for appeal was denied and once the case was remanded back to this Court, the parties participated in a meet-and-confer teleconference pursuant to Rule 26(f) on August 14, 2013 to discuss discovery and the scheduling of case milestones.  Thereafter, Lead Plaintiff propounded its first set of requests for the production of documents ("RFPs") to the Defendants, consisting of 53 discrete requests seeking documents on a variety of topics relevant to Lead Plaintiff's claims.  On August 30, 2014, the parties exchanged their initial disclosures.  Defendants submitted their responses and objections to Lead Plaintiff's RFPs on October 7, 2013.  During this time, the parties also negotiated a protocol regarding the production of electronically stored information.

36.    After meeting and conferring regarding the scope of the documents to be produced pursuant to Lead Plaintiff's requests, Defendants made an initial production of over 137,000 pages of documents on October 7, 2013.  These documents largely consisted of the documents that LHC produced to the SFC and the SEC in connection with their respective investigations.  Defendants also produced their relevant insurance policies.

37.    Prior to receiving the production, Lead Counsel engaged several e-discovery vendors and sought competitive bids for a contract to upload, store, and allow for the expeditious review of such a large production of documents.  After contracting with the chosen vendor and once the documents were uploaded and ready for review, Lead Plaintiff reviewed the produced documents.

38.     In addition to seeking formal discovery from Defendants, Lead Counsel also pursued support for its claims through FOIA requests from government entities charged with overseeing LHC.  Lead Counsel sent FOIA requests to the SEC and to the OIG HHS.  After a negotiation regarding the scope of documents to be produced and the cost of the production, the SEC ultimately produced redacted transcripts from depositions that were taken in the course of the SEC's investigation into LHC's practices.  Lead Counsel's FOIA request to the OIG HHS remained pending when the Settlement was reached.

39.     On October 16, 2013, Defendants served their first set of requests for production of documents on Lead Plaintiff.  This set included 34 separate requests for documents.  That same day, Defendants served their first set of interrogatories on Lead Plaintiff.  The first set of interrogatories included 14 detailed interrogatories.

40.     In responding to the requests for production and interrogatories, Lead Counsel conducted several conference calls with personnel from Lead Plaintiff to facilitate the collection and review of Lead Plaintiff's internal documents.  Lead Plaintiff served its responses to the requests for production and interrogatories on December 2, 2013.

41.     On September 5, 2013, a telephonic scheduling conference took place with Magistrate Judge Hill with counsel for all parities appearing.  Thereafter, the parties negotiated and executed a protective order regarding confidential information, which was submitted to the Court on September 26, 2013.  The Court entered the protective order on October 1, 2013.  On October 22, 2013, Magistrate Judge Hill held a status conference in chambers regarding the schedule for Lead Plaintiff's class certification motion and hearing.

### F.       Class Certification

42.      Like the other aspects of the litigation, class certification was expected to be vigorously contested.  Despite the fact that Lead Plaintiff's motion for class certification was not set to be filed until after the mediation with Judge Phillips, Lead Counsel still undertook extensive preparation for the filing of the motion in the event that the mediation did not result in settlement.  Indeed, a settlement in principle was not reached until March 20, 2013, the day before Lead Plaintiff's class certification motion was due to be filed with the Court.  Thus, in the event the settlement negotiations were unsuccessful, Lead Counsel drafted a memorandum in support of class certification.  In addition, Lead Counsel consulted with experts and undertook extensive legal research.

### G.       Mediation

43.      Subsequent to the status conference with Magistrate Judge Hill, the parties sought the assistance of a mediator to resolve the case.  The parties ultimately retained Judge Phillips. After preparing lengthy and detailed mediation statements and reply briefs, the mediation took place on March 7, 2014 in New York.  Although a settlement was not reached during the initial mediation session, the parties continued working with Judge Phillips to resolve the claims.  After a series of mediator's recommendations and proposals, on March 20, 2014, the parties reached an agreement-in-principle to settle the litigation.  The parties then negotiated the Stipulation and supporting documents.  The Stipulation was executed on June 16, 2014, and Lead Counsel prepared a motion for preliminary approval of the Settlement, which was granted by the Court on August 1, 2014.

## IV.    SUMMARY OF THE SETTLEMENT AND THE PLAN OF ALLOCATION

44.     The Settlement consists of $7,850,000 in cash, plus interest.  The Class consists of: all persons other than Defendants, directors, and officers of LHC and their families and affiliates who purchased or otherwise acquired LHC common stock between July 30, 2008 and October 26, 2011, inclusive.

45.     The Net Settlement Fund[3] is to be distributed pursuant to the Plan of Allocation to those Class Members submitting valid claims (the "Authorized Claimants").  As set forth in the Notice, the Claims Administrator shall determine each Authorized Claimant's share of the Net Settlement Fund based upon the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants and is thus fair, reasonable, and adequate.

46.     The proposed Plan of Allocation was formulated with the assistance of damages experts at Stanford Consulting Group, after discussions with Lead Counsel, concerning, among other things, an estimate of the damages suffered by Class Members, the likelihood of establishing liability for various periods of the Class, and the relative strengths and weaknesses of their respective claims.

47.     The proposed Plan of Allocation is based on: (a) Lead Plaintiff's allegation that the price of LHC common stock was artificially inflated during the Class Period and that members of the Class purchased LHC common stock at artificially high prices due to Defendants' alleged material misrepresentations and omissions; and (b) the premise that the decrease in the price of LHC common stock that occurred after corrective disclosures may be

---

[3]     The term "Net Settlement Fund" means the Settlement Fund, less payment of expenses of notice and administration of the Settlement, Taxes, and Tax Expenses, and such attorneys' fees, costs, expenses, and interest as may be awarded by the Court.

used to measure the alleged artificial inflation in the price of LHC common stock prior to such disclosures.

48.     Pursuant to the Court's Preliminary Approval Order, Lead Counsel, through the Claims Administrator, implemented a comprehensive notice program whereby notice was given to the members of the Class by mail and by publication.  The Notice disclosed, among other things, the following information necessary to evaluate the benefits of the Settlement to Class Members: (a) the amount of the Settlement Fund to be distributed to Authorized Claimants on a per share basis; (b) the Plan of Allocation; (c) that Plaintiff's Counsel would apply for a fee award in an amount of up to 33-1/3% of the Settlement Fund and would request reimbursement of their costs and expenses in an amount not to exceed $172,000; (d) that Lead Plaintiff would request reimbursement of its costs and expenses in an amount not to exceed $5,000; (e) that any Class Member could object to the fee and expense applications; (f) a detailed explanation of the reasons for the Settlement; (g) that objections to the Settlement must be filed with the Court and served on the parties by November 4, 2014; (h) that requests for exclusion from the Settlement must be filed no later than November 11, 2014; and (i) that January 9, 2015 would be the deadline for filing Proofs of Claim.  Copies of the Notice and a Proof of Claim form (collectively, the "Notice Packet") were mailed to all record transferees of LHC common stock during the Class Period as shown in the transfer records obtained from LHC's transfer agent.

49.     Copies of the Notice Packet were also mailed to major brokerage houses, which act as nominees for many security holders, together with a letter requesting them to forward copies of the Notice to their beneficiaries or to provide the Claims Administrator with lists of their beneficiaries so that the Claims Administrator could forward copies to the beneficiaries. Pursuant to this procedure, as of October 17, 2014, the Claims Administrator had disseminated

over 52,000 Notice Packets to potential Class Members.  *See* Supplemental Declaration of Jennifer M. Keough Regarding Notice Dissemination and Publication ("Supp. Keough Decl."), ¶3.  In addition, on August 27, 2014, summary notices were published in *Investor's Business Daily* and *PR Newswire* (ECF No. 78-1 (Keough Decl.), ¶10), and a complete set of the Settlement papers were posted on the Claims Administrator's website at www.lhcsecuritieslitigation.com, which became operational on August 22, 2014.  *Id.*, ¶12. Furthermore, the Claims Administrator established a toll-free interactive voice response system to inform potential Class Members of basic settlement information such as the claim-filing deadline and that they can download a copy of the Notice Packet from the website.  *Id.*, ¶11.

50.     As set forth in the Preliminary Approval Order, the deadline for Class Members to object to the Settlement, the Plan of Allocation, or to the application for attorneys' fees and expenses is November 4, 2014.  The deadline for Class Members to exclude themselves from the Class is November 11, 2014.  While these deadlines have not yet passed, to date, not a single Class Member has objected to, or requested exclusion from, the Settlement.  *Id.*, ¶¶13-14; Supp. Keough Decl., ¶¶4-5.

**V.     THE STRENGTHS AND WEAKNESSES OF THE CASE**

51.     Based on the publicly available documents, discovery obtained, and Lead Counsel's consultation with investigators and experts, Lead Plaintiff believes that it had uncovered and would continue to uncover, substantial evidence to support its claims.  Lead Plaintiff also realized, however, that it faced considerable risks as the case proceeded.  These risks were carefully considered in evaluating whether the Settlement was in the Class's best interests.

52.     In this regard, Defendants raised defenses to nearly every element of Lead Plaintiff's claims.[4]  For example, Defendants argued that Lead Plaintiff would be unable to prove that Defendants made false statements because it would be unable to prove that the shift in LHC's business practices identified in the AC were the result of fraudulent Medicare billing as opposed to a legal and legitimate change in its business model in response to changes in Medicare reimbursement guidelines.  In support, Defendants argued that, notwithstanding the conclusions in the SFC Report, the SEC staff, after a two-and-a-half year investigation, terminated its investigation without recommending any enforcement action.  LHC further argued that discovery would demonstrate the Company had a comprehensive compliance program that was rigorously enforced consistent with Defendants' public statements.

53.     Defendants also argued that Lead Plaintiff would be unable to prove scienter – *i.e.,* that Defendants acted with knowledge of or with recklessness as to the alleged falsity of their statements and omissions – for the same reason it would be unable to establish falsity.  In addition, Defendants argued that the SFC Report did not constitute a finding of wrongdoing. Further, Defendants argued that Defendant Myers' trading of LHC shares during the Class Period was not persuasive evidence of scienter because: (a) he was simply following his investment adviser's advice and reducing risk by diversifying his investment portfolio, as a large

---

[4]     To prevail on its claim for violation of §10(b) of the Exchange Act, Plaintiff was required to establish:  "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011).

percentage of his wealth was concentrated in LHC common stock; and (b) about half of his trading was done pursuant to a Rule 10b5-1 Plan.[5]

54.     In addition, Defendants argued that notwithstanding the District Court's decision that loss causation had been adequately alleged consistent with a Rule 8 pleading standard, Lead Plaintiff would be unable to prove loss causation at the summary judgment stage or trial.  In particular, Defendants argued that they never admitted to the wrongful conduct alleged, and that Lead Plaintiff would not be able to apportion the decline in LHC's stock price on the last day of the Class Period between fraud-related and non-fraud-related causes.  Indeed, Lead Plaintiff's own consulting expert with respect to loss causation and damages issues found that there was no statistically significant movement in the price of LHC common stock following three of the corrective disclosures alleged in the AC.

55.     Finally, Defendants argued that Lead Plaintiff faced significant difficulty in surmounting the barriers to class certification.  At the time settlement discussions were ongoing, the Supreme Court had recently granted *certiorari* in *Halliburton Co. v. Erica P. John Fund, Inc.*, 718 F.3d 423 (5th Cir. 2013), *cert. granted*, 134 S. Ct. 636 (2013), and was poised to hear arguments on the question of whether *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) should be overruled or modified to the extent it recognized a presumption of class-wide reliance derived from the fraud-on-the-market theory.  Even though the prospect that *Basic* would be overturned in its entirety seemed unlikely, Defendants argued that Lead Plaintiff was facing the possibility that the burdens imposed on plaintiffs at the class certification stage would be further increased.

---

[5]     A Rule 10b5-1 plan allows corporate insiders to sell a predetermined number of shares at a predetermined time.  *See* 17 C.F.R. §240.10b5-1(c).  That an insider's sales were made pursuant to a Rule 10b5-1 plan provides an affirmative defense to accusations of insider trading. *Id.*

56.     While Lead Plaintiff had what it believed were meritorious responses to all of the foregoing arguments, the risks: (a) of a change in the law that would make class certification more difficult; or (b) that even absent a change in the law, it would not prevail at the class certification stage, or on the merits at summary judgment or trial, were substantial and informed Lead Plaintiff's decision to enter into the Settlement.

57.     Further, even if Lead Plaintiff prevailed on liability on any or all of its claims and was awarded some or all of its damages, there was the high likelihood that Defendants would appeal the verdict and award.  The appeals process would likely span several years, during which time the Class would receive no distribution on any damage award.  In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no distribution despite having prevailed on the claims at trial.

58.     In summary, there were multiple procedural hurdles, as well as significant merit-based risks involved in proceeding with the litigation, each of which was carefully considered by Lead Counsel and Lead Plaintiff in making the determination to settle with Defendants on the agreed terms.

## VI.     THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

59.     Having considered the foregoing strengths and weaknesses of the claims, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the Settlement of this matter before this Court and the Plan of Allocation are fair, reasonable, adequate, and in the best interests of the Class.

## VII.   LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.   A Reasonable Percentage of the Fund Recovered Is the Appropriate Method to Use in Awarding Attorneys' Fees in Common Fund Cases

60.   For its extensive efforts on behalf of the Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis.   Courts recognize that the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery.

### B.   Consideration of Relevant Factors Justify an Award of 33-1/3% Fee in This Case

61.   The Notice provides that Lead Counsel will seek a fee award of 33-1/3% of the Settlement Fund plus expenses not to exceed $172,000.   Lead Counsel submit that such an award is reasonable and appropriate under the circumstances.   Numerous factors are present here that justify this Court's award of this fee.

#### 1.   The Settlement Benefit Achieved

62.   Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award.   *See Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained").   Here, the $7,850,000 Settlement is a very good result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action was to continue to trial and likely through post-trial motions and appeals.

63.   This favorable Settlement was achieved as a result of very extensive investigative efforts, contentious and complicated motions practice, and vigorous, arm's-length settlement negotiations with the assistance of a respected and skilled mediator.   Accordingly, there was no collusion during any part of the settlement negotiations.   As a result of this Settlement, hundreds,

if not thousands, of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of settlement.

**2.     The Risk of Contingent Class Action Litigation**

64.     This Declaration and the memoranda in support of the Settlement and the fee request describe the substantial risks of the litigation.  Those same difficulties also constituted risks that Lead Counsel might never be paid for their efforts.

65.     Indeed, courts in this Circuit have consistently recognized that risk is an important factor in determining an appropriate fee award.  There are numerous cases where class counsel in contingent fee cases such as this, after expenditures of thousands of hours and significant out-of-pocket expenditures, have received no compensation whatsoever.  Lead Counsel knows from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this is never assured.

66.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs take an active role in protecting the interests of shareholders.

67.     Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort.  More evidence of the significant risk undertaken by Lead Counsel was the fact that Lead Plaintiff and Lead Counsel were the only movants to seek appointment as Lead Plaintiff and Lead Counsel, as other members of the securities bar recognized the risk inherent in this litigation.

68.     As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.  Lead Plaintiff's success was by no means assured. Defendants disputed whether Lead Plaintiff could even establish liability and would no doubt contend, as the case proceeded to trial, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged.  Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery likely.  It is also possible that a jury could have found no liability or no damages.  Lead Counsel therefore believe that based upon the substantial risk factors present that an award of attorneys' fees of 33-1/3% of the Settlement Fund is reasonable.

### 3.     The Diligent Prosecution of This Case

69.     The requested fee is also warranted in light of the extensive efforts on the part of Lead Counsel, as outlined above, required to produce this result.  Lead Counsel and their in-house professionals spent approximately 2,095 hours of time on this case, including conducting formal and informal discovery, reviewing and analyzing the approximately 137,000 pages of documents produced in discovery, mastering the relevant facts and dynamics of Defendants' business, drafting complaints and comprehensive memoranda of law concerning difficult legal issues in connection with motions to dismiss and Defendants' petition for interlocutory appeal, and formulating strategy, all in order to prepare for trial, make effective arguments on the merits, and to conduct meaningful settlement discussions.  Liaison Counsel has spent 46.3 hours on this Action.  The resulting loadstar is $1,225,920.50.  The requested fee results in a 2.13 multiplier, a figure well within the range that courts approve.  *See* Declaration of Daryl F. Scott in Support of Scott+Scott Attorneys at Law LLP's Application for Award of Attorneys' Fees and

24

Reimbursement of Expenses, ¶¶5-6; and Declaration of Andrew A. Lemmon in Support of the Lemmon Law Firm's Application for Award of Attorneys' Fees and Reimbursement of Expenses, ¶¶5-6.

### 4.     The Complexity of This Action's Factual and Legal Questions

70.     Numerous courts have recognized that risk as well as the novelty and difficulty of the issues presented are important factors in determining a fee award.

71.     There is no question that from its outset, the litigation presented a number of sharply contested issues of both fact and law and that Lead Plaintiff faced formidable defenses to liability and damages.   The substantial risks and uncertainties in this case made it far from certain that any recovery, let alone $7.85 million, would ultimately be obtained.   From the outset, this Action was an especially difficult and highly uncertain securities case, with no assurance whatsoever that the Action would survive Defendants' attacks on the pleadings, motions for summary judgment, trial, and appeal.   Although Lead Plaintiff's claims ultimately survived the pleading stage, very difficult issues of proof remained at class certification, summary judgment, and at trial as to key elements of the claims for securities law violations.

### 5.     Plaintiff's Counsel's Work and Experience

72.     Lead Counsel, Scott+Scott, is a national law firm which specializes in shareholder class and other complex class representation.   The record in this case, along with the matters described in this Declaration, demonstrate the enormous effort and expense that went into successfully resolving this litigation.   Lead Counsel's declarations outline the amount of time spent by each attorney and paralegal employed by Plaintiff's Counsel and the lodestar calculation based on current billing rates, demonstrating that a 33-1/3% fee is reasonable for the extraordinary results achieved in this case.

### 6.    Standing and Caliber of Opposing Counsel

73.    The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Defendants were represented by Alston & Bird LLP and Jones Walker LLP.  In the face of this knowledgeable, formidable, and well-financed opposition, Lead Counsel were able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that were highly favorable to the Class.

## VIII.  PAYMENT OF THE REQUESTED EXPENSES AND COSTS IS FAIR AND REASONABLE

74.    Lead and Liaison Counsel are also moving for payment of $163,228.52 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting the claims against Defendants.  Plaintiff's Counsel advanced all of the litigation expenses.

75.    From the beginning of the case, Lead Counsel were aware that they might never recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced by them to prosecute this Action.  Thus, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

76.    In view of the complex nature of the Action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, Lead Counsel respectfully submit that the request for expenses be granted.

77.    Lead Plaintiff Omaha Police and Fire seeks modest reimbursement for the time it has expended on behalf of the Class.  Lead Counsel believe, based on their knowledge of Lead

Plaintiff's activity in this case and a review of the Declaration submitted herewith, the amount requested is reasonable and should be approved by the Court. Moreover, the Notice stated that Lead Plaintiff would seek reimbursement of costs and expenses in an amount not to exceed $5,000 and, to date, there have been no objections to such a request.

## IX.   EXHIBITS

78.    Attached hereto as Exhibit A is a true and correct copy of Denise N. Martin, Vinita M. Juneja, Todd S. Foster, & Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* 12-13 (NERA Nov. 1996).

## X.   CONCLUSION

79.    For all the foregoing reasons, Lead Counsel respectfully requests that the Court approve the Settlement and Plan of Allocation and award attorneys' fees of 33-1/3% of the Settlement Fund, plus $163,228.52 in expenses that were incurred in connection with the litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 21, 2014, in New York, New York.

Respectfully submitted,

DEBORAH CLARK-WEINTRAUB
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
Telephone:  (212) 223-6444
Facsimile:   (212) 223-6334
Email:  dweintraub@scott-scott.com

27

# EXHIBIT A

RECENT TRENDS IV:
WHAT EXPLAINS FILINGS AND SETTLEMENTS
IN SHAREHOLDER CLASS ACTIONS?

by

Denise N. Martin, Vinita M. Juneja,
Todd S. Foster, Frederick C. Dunbar

November 1996

# NATIONAL ECONOMIC RESEARCH ASSOCIATES

50 MAIN STREET, WHITE PLAINS, NEW YORK 10606
TELEPHONE: 914.448.4000  FACSIMILE: 914.448.4040

National Economic Research Associates, Inc. (NERA), a Marsh & McLennan Company, is an international firm of consulting economists that provides research and analysis on a wide variety of business and public policy issues. We support our findings with careful documentation and translate complex material into clear language.

Established in 1961, NERA has earned wide recognition for its work in energy, public utility regulation, antitrust, environment, securities litigation, transportation, health, international trade, labor, telecommunications and sports. The firm consists of more than 275 full-time staff members highly qualified in economics, finance, statistics, business administration, computer science and mathematics. NERA has completed assignments for many of the world's largest corporations and law firms, federal, state and municipal agencies, and governments.

n/e/r/a

*Consulting Economists*

- 12 -

shareholder litigation reform.  Consistent with the results in Grundfest's study, the sample of cases for which we have plaintiffs' claimed damages indicates that 20 percent settled for less than $2 million (Table 8a).  The ratio of awards to claimed damages has a mean and dispersion similar to the larger investor losses sample described below.[16]

In Table 8b, we examine the sample of cases for which we calculated investor losses and find, similarly, that about 26 percent of the settlements between 1991 and June 1996 are less than $2 million.  As in the plaintiffs' claimed damages analysis, our data also reveal that many of these cases settle for a lower proportion of investor losses than suits with higher absolute settlements (Figure 5).

We estimate that at least 21 percent, and possibly 42 percent of these low-value settlements may well be nuisance suits, and are likely settling for nuisance value.  We first note that about 9 percent of settlements are for less than $1 million.  Of these, about two-thirds settle for an amount that is a much smaller fraction of total investor losses than the average for the whole sample.  Most of the rest of the suits with settlements under $2 million also settle at less than the average percentage of investor losses but only about a third of them are at a much smaller fraction of total investor losses than the average for the whole sample.  Notably, we find that the average settlement as a percentage of investor losses for the settlements between $1 million and $2 million is also lower than the average for the full sample.

### E.    Plaintiffs' Attorneys' Fees

In Table 9, we present the fees (and fees and expenses, when known) allocated to plaintiffs' attorneys.  Not much here has changed over the past several years.  Regardless of case

---

    (...cont'd)

        avoidable defense costs unless the defendant recognizes some probability, however small, that a jury will rule in plaintiffs' favor." Joseph A. Grundfest, "Why Disimply?" *Harvard Law Review*, Vol. 108, 1995, pp. 740-741.

[16]   Low value suits are not necessarily indicative of a lack of merit.  For example, these settlements may represent the efficient outcome of negotiations between plaintiffs and defendants in cases where a jury trial would be particularly costly or risky.  For a more detailed description of the theoretical reasoning, see Dunbar, et al., October 1995.

- 13 -

size, fees average approximately 32 percent of the settlement. This finding holds even for cases with settlements in excess of $50 million. For the period 1991 through June 1996, fees to plaintiffs' attorneys (in cases where fees could be separated from expenses) total $1 billion.

Cases for which an aggregated figure for fees and expenses was reported are presented in the bottom half of Table 9. In contrast to the findings for fees alone, the total of fees and expenses decline as a percentage of settlement value when settlement value exceeds $50 million. This result may indicate that expenses are relatively independent of size of settlement; that is, a case with a large settlement incurs about the same expenses as a small case. Given the small sample of cases in this category, however, we cannot draw any general conclusions about the pattern of expenses.

F.    **Case Dispositions and Filings by Defendants' Primary Industry**

As is apparent from Table 10a, high-technology companies are a major focus of securities fraud class actions. In the past, almost one-third of the settlements have come from this sector. However, in 1995, only 27 percent of settlements came from the high-technology sector, down from 34 percent in 1994. And, so far in 1996, the percentage of settlements by high-technology companies has slowed considerably to 15 percent. In addition, as Table 10b demonstrates, dismissals as a percent of all dispositions in this sector are somewhat higher than the average dismissal rate. So although cases continue to be filed in this sector more than ever, either plaintiffs or defendants seem to be waiting to settle, perhaps waiting for a motion to dismiss to be decided.

Over the past six months, approximately 10 percent of settlements involved the financial and insurance sector (a group that excludes commercial banking), the highest percentage settled in this industry over the 1991 to 1996 time period. Similarly, filings in this sector over the past 10 months are at a higher percentage of the total filings than they have been since 1994. Also, as Table 10b demonstrates, dismissals as a percent of dispositions in this sector run at a much higher rate than the average dismissal rate and than the rate for other sectors we have classified. The data also suggest that plaintiffs' attorneys' fees as a percentage of the settlement