# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CITY OF OMAHA POLICE & FIRE RETIREMENT SYSTEM** | * | **CIVIL NO. 6:12-1609** |
| **VERSUS** | * | **JUDGE TRIMBLE** |
| **LHC GROUP, ET AL** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

Pending before the undersigned is Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds filed on October 21, 2014, by City of Omaha Police and Fire Retirement System ("Lead Plaintiff" or "Omaha Police and Fire").  [rec. doc. 79].  No opposition has been filed, and the deadline for filing opposition has expired.[1]

On December 11, 2014, the undersigned held a hearing in open court on the motion.  [rec. doc. 83].  At that hearing, the parties agreed to settle this action for $7,850,000.00 in cash.  By separate motion, Lead Plaaintiff seekd attorney fees in the amount of 33 1/3% of the Settlement Fund, for reimbursement of litigation expenses in the amount of $163,228.52 and a compensatory award of $5,000.00 to the Lead Plaintiff as reimbursement for the costs and expenses incurred as a direct result of its representation of the Class. [rec. doc. 80]. Defendants, LHC Group, Inc. ("LHC") and Keith G. Myers ("Myers"), agreed to the settlement amount and took no position on the allocation to class counsel or to the Lead Plaintiff. Following the hearing, the undersigned took the motion under advisement.

For the following reasons, the undersigned recommends that motion be **GRANTED**.

---

[1]LR 7.5 W requires that opposition be filed within 21 days of service of the motion.

**Background**

This matter is a securities fraud class action on behalf of investors who purchased or acquired LHC common stock between July 30, 2008 and October 26, 2011 (the "Class Period"), inclusive, against LHC and its CEO, Myers.

LHC is a home health care company which provides post-acute health care services to patients through its home nursing agencies, hospices and long-term acute care hospitals.  [rec. doc. 30, Amended Complaint, ¶ 2; *see also* rec. doc. 37, Memorandum Ruling]. Counsel for the plaintiffs makes the following alleagtions:   During the Class Period, LHC's revenues increased dramatically.  [rec. doc. 30, ¶ 2].  LHC and Myers informed investors that the increase was due to "organic growth" and acquisitions.  [*Id.*].

Medicare pays home health care providers such as LHC for each home visit, with bonuses when certain thresholds are met.  [rec. doc. 30, ¶ 3].  Prior to 2008, Medicare paid bonuses when a home healthcare patient reached a 10-visit threshold.  [*Id.*].  On January 1, 2008, Medicare changed its bonus policy and began paying bonuses at intervals of six, 14 and 20 visits. [*Id.*]

Shortly after the policy change, which marks the beginning of the Class Period, LHC instructed its healthcare providers to meet the new thresholds regardless of patient need.  [rec. doc. 30, ¶ 4].  The year following the bonus level changes, the proportion of LHC's patients receiving 6, 14 and 20 visits increased 126%, 75% and 189%, respectively. [*Id.*].  Concurrently, the proportion of patients receiving 10 visits – the old bonus threshold – declined 67% in 2008.  [*Id.*].

LHC informed investors that it was in full compliance with all applicable laws, touting the quality and comprehensiveness of its compliance department.  [*Id*.].  LHC further claimed that its compliance program represented a competitive advantage.  [*Id*.].

Prompted by an article in the *Wall Street Journal*, the Senate Finance Committee ("SFC") opened an official investigation into LHC's practices on May 12, 2010.  [rec. doc. 30, ¶ 6].  Consequently, LHC's stock declined 7% within two days.  [*Id*.].

On July 13, 2010, LHC announced that the SEC (Securities and Exchange Commission) had initiated an investigation of the same Medicare abuses which prompted the SFC's investigation.  [rec. doc. 30, ¶ 7].  LHC's stock declined another 7%.  [*Id*.].  LHC continued to claim that it provided health care based only upon "patient needs," rather than financial incentives.  [*Id*.].

On October 3, 2011, the SFC released a report (the "Senate Report") analyzing the home therapy practices of LHC and its competitors.  The Senate Report concluded that the home health therapy practices identified "at best represent abuses of the Medicare home health program," and "[a]t worst," might be "defrauding the Medicare home health program at the expense of taxpayers."  [rec. doc. 30, ¶ 8].  The report found that LHC's therapy metrics pointed "to a pattern of attempting to achieve the most profitable number of therapy visits."  [rec. doc. 30, ¶ 9].  Additionally, the report cited "a centralized push from LHC Group management to increase the number of therapy visits performed."  [*Id*.].  As support, the report cited an email from Myers about the need to increase the number of therapy visits performed by LHC in order to meet bonus thresholds.  [*Id*.].

After the publication of the Senate Report, LHC's stock price dropped from $17.06 to $15.01, a 12% decline, in two days. [rec. doc. 30, ¶ 11].  Lead Plaintiff asserts that this decrease was a result of the artificial inflation caused by defendants' misleading statements.  [*Id*.].

During the Class Period from 2008 to 2011, Myers sold over $20 million of his personal holdings of LHC stock.  [rec. doc. 30, ¶¶ 12, 102].

After the close of the market on October 26, 2011, LHC announced disappointing preliminary results for the third quarter of 2011 and reduced its earnings and revenue guidance for fiscal 2011, resulting in a further 15% decline in the company's stock price.  [rec. doc. 30, ¶83; rec. doc. 79, Weintraub Declaration, ¶ 21].

### Procedural History

On June 13, 2012, Omaha Police and Fire filed the first securities class action against LHC and Meyers in this Court.  [rec. doc. 1].  On August 13, 2012, Omaha Police and Fire moved for appointment as Lead Plaintiff and further moved the Court to appoint Scott+Scott as Lead Counsel and the Lemmon Law Firm as Liaison Counsel.  [rec. doc. 13].  By Order dated September 18, 2012, the Court granted the motion.  [rec. doc. 29].

On November 2, 2012, Lead Plaintiff filed an Amended Complaint asserting claims under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5.  [rec. doc. 30, ¶ 13]  The Amended Complaint alleged, *inter alia*, that defendants made false and misleading statements and concealed material facts regarding the source of LHC's increased revenues, the strength of LHC's compliance program, and whether Medicare reimbursement played a factor in patient decisions.  It also alleged that Myers profited from LHC's artificially inflated share price by selling approximately 650,000 LHC shares that he owned for aggregate proceeds of over $20,000,000.00.

On December 17, 2012, defendants filed a motion to dismiss.  [rec. doc. 31].  On January 31, 2013, Lead Plaintiff filed an opposition to defendants' motion.  [rec. doc. 34].  On March 4, 2013, defendants filed a reply brief in support of their motion to dismiss.  [rec. doc. 35].

On March 15, 2013, Judge Trimble issued a Memorandum Ruling and Judgment denying the  motion to dismiss.  [rec. docs. 37, 38].  On April 12, 2013, defendants filed a Motion to Amend Order to Include Certification for Interlocutory Appeal and for Stay of Proceedings.  [rec. doc. 41].  Lead Plaintiff filed opposition to the motion.  [rec. doc. 48].  Defendants filed a reply.  [rec. doc. 54].  By Memorandum Ruling and Order dated May 23, 2013, Judge Trimble granted the motion.  [rec. doc. 56, 57].

On April 15, 2013, defendants filed an Answer and Defenses to the Amended Complaint.  [rec. doc. 42].

On April 26, 2014, Lead Plaintiff filed a Motion to Compel Participation in Rule 26(f) Conference.  [rec. doc. 46].  Defendants opposed the motion.  [rec. doc. 49].  On May 14, 2013, the undersigned held a telephone hearing in which I denied the motion to compel. [rec. doc. 55].

On June 4, 2013, defendants filed their appellate brief with the United States Court of Appeals for the Fifth Circuit [Case No. 13-90033].  [rec. doc. 79, Weintraub Declaration "Weintraub Declaration"), ¶ 34]. Lead Plaintiff filed its opposition to defendants' request for appeal on June 17, 2013.   [*Id*.]  On July 18, 2013, the Fifth Circuit issued an Order declining to take defendants' interlocutory appeal.  [rec. doc. 62].

On August 5, 2013, the Court issued a Scheduling Conference Order setting a Scheduling Conference before the undersigned on September 5, 2013.  [rec. doc. 63].

On August 14, 2013, the parties participated in a telephonic Rule 26(f) Conference. [rec. doc. 79, Weintraub Declaration, ¶ 35].  Afterwards, Lead Plaintiff propounded its first set of

requests for production of documents to defendants, consisting of 53 requests.  [*Id.*].  On August 30, 2014, the parties exchanged their initial disclosures.  [*Id*].

On September 6, 2013, the undersigned held a telephone status conference and ordered the parties to submit a proposed case-specific Scheduling Order.  [rec. doc. 64].  On September 26, 2013, the parties negotiated and executed a stipulation and protective order regarding confidential information, which was submitted to the Court.  [rec. doc. 67].  The Court entered the stipulation and protective order on October 1, 2013.  [rec. doc. 68].

On October 7, 2013, defendants submitted their responses and objections to Lead Plaintiff's discovery requests.  [Weintraub Declaration, ¶ 35].  In response to the request for production, defendants produced over 137,000 pages of documents, consisting largely of the documents that LHC produced to the SFC and the SEC in connection with their respective investigations and defendants' relevant insurance policies.  [Weintraub Declaration, ¶ 36].  During this time, the parties also negotiated a protocol regarding the production of electronically stored information.   [*Id*. at ¶ 35]

On October 16, 2013, defendants served their first set of requests for production of documents and interrogatories, consisting of 34 separate requests for documents and 14 detailed interrogatories.  [Weintraub Declaration, ¶ 39].  Lead Plaintiff served its responses to defendants' discovery requests on December 2, 2013.  [Weintraub Declaration, ¶ 40].

On October 22, 2013, the undersigned held a status conference in Chambers regarding the schedule for Lead Plaintiff's class certification motion and hearing.  On November 26, 2013, the parties filed a Joint Motion to Enter Proposed Scheduling Order.  [rec. doc. 70].  By Order dated January 9, 2014, the undersigned granted the motion and set the hearing on class certification for October 1, 2014.  [rec. doc. 71].

Subsequent to the status conference, the parties retained a private mediator, Hon. Layn R. Phillips (Ret.) ("Judge Phillips").  [Weintraub Declaration, ¶ 43].   The mediation took place on March 7, 2014, in New York.  [*Id.*].  Although a settlement was not reached during the initial mediation session, the parties continued working with Judge Phillips to resolve the claims.  [*Id.*].

On March 20, 2014, the parties reached an agreement-in-principle to settle the litigation. This happened to be the day before Lead Plaintiff's class certification motion was due to be filed with the Court.  [Weintraub Declaration, ¶ 42].  In the event the settlement negotiations were unsuccessful, Lead Counsel drafted a memorandum in support of class certification, consulted with experts and undertook extensive legal research.  [*Id.*].

After the parties reached an agreement-in-principle, the parties negotiated the Stipulation and supporting documents.  [Weintraub Declaration, ¶ 43].  The Stipulation was executed on June 16, 2014.  [*Id.*].

## Preliminary Approval

On June 17, 2014, Lead Plaintiff filed an Unopposed Motion for Preliminary Approval of Class Action Settlement.  [rec. doc.72].  On August 1, 2014, Judge Trimble signed an Order Preliminarily Approving Settlement and Providing for Notice.  [rec. doc. 76].  The Order set the Settlement Hearing for December 11, 2014, at 1:30 p.m.

## Notice

Pursuant to the Court's Preliminary Approval Order, Lead Counsel, through the Class Administrator,[2] implemented a notice program giving notice to the members of the Class by mail

---

[2]The Garden City Group, Inc. was retained by Lead Plaintiff and appointed pursuant to the Court's Order to serve as Claims Administrator.

7

and by publication.  [rec. doc. 76].  The Notice disclosed, among other things, the following

information necessary to evaluate the benefits of the Settlement to Class Members:

> (a) the amount of the Settlement Fund to be distributed to Authorized Claimants on a per share basis;

> (b) the Plan of Allocation;

> (c) that Plaintiff's Counsel would apply for a fee award in an amount of up to 33 1/3% of the Settlement Fund and would request reimbursement of their costs and expenses in an amount not to exceed $172,000.00;

> (d) that Lead Plaintiff would request reimbursement of its costs and expenses in an amount not to exceed $5,000.00;

> (e) that any Class Member could object to the fee and expense applications;

> (f) a detailed explanation of the reasons for the Settlement;

> (g) that objections to the Settlement must be filed with the Court and served on the parties by November 4, 2014;

> (h) that requests for exclusion from the Settlement must be filed no later than November 11, 2014; and

> (i) that January 9, 2015, would be the deadline for filing Proofs of Claim.

Copies of the Notice and a Proof of Claim form (collectively, the "Notice Packet") were

mailed to all record transferees of LHC common stock during the Class Period and major

brokerage houses, which act as nominees for many security holders, together with a letter

requesting them to forward copies of the Notice to their beneficiaries or to provide the Claims

Administrator with lists of their beneficiaries so that the Claims Administrator could forward

copies to the beneficiaries.  [rec. doc. 79, Supplemental Declaration of Jennifer M. Keough

Regarding Notice Dissemination and Publication ("Supp. Keough Declaration"), ¶ 3].

Pursuant to this procedure, as of October 17, 2014, the Claims Administrator had

disseminated 54,463 Notice Packets to potential Class Members.   [Supp. Keough Declaration, ¶

3].  In addition, on August 27, 2014, summary notices were published in *Investor's Business Daily* and *PR Newswire* [rec. doc. 78, Keough Declaration ("Keough Declaration"), ¶ 10], and a complete set of the Settlement papers were posted on the Claims Administrator's website at www.lhcsecuritieslitigation.com, which became operational on August 22, 2014 [Keough Declaration ¶ 12].  Further, the Claims Administrator established a toll-free interactive voice response systems to inform potential Class Members of basic settlement information such as the claim-filing deadline and that they could download a copy of the Notice Packet from the website.   [Keough Declaration ¶ 11].

As set forth in the Order, the deadline for Class Members to object to the Settlement, the Plan of Allocation, or to the application for attorneys' fees and expenses was November 4, 2014. [rec. doc. 76, ¶ 14].  The deadline for Class Members to exclude themselves from the Class was November 11, 2014.  As of the deadline, not one Class Member had objected to, or requested exclusion from, the Settlement.  [Supp. Keough Declaration ¶¶ 4-5].

Courts have found comparable notice programs to meet the requirements of due process. *See Enron Corp. Securities & ERISA Litigations*, 2003 WL 22494413, *3 (S.D. Texas July 24, 2003); *In re OCA, Inc. Securities and Derivative Litigation*, 2008 WL 4681369, * 14-16 (E.D. La. Oct. 17, 2008).  After reviewing the Notice, the undersigned finds that it meets the requirements of Fed. R. Civ. P. 23(c)(3).

### Final Approval

On October 21, 2014, Lead Plaintiff filed the instant Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds.  [rec. doc. 79].  On October 21, 2014, Lead Plaintiff also filed a Motion for Award of Attorneys' Fees and Reimbursement of

Litigation Costs and Expenses.  [rec. doc. 80].  On December 3, 3014, Lead Plaintiff filed a Reply Memorandum in support of both motions.  [rec. doc. 81].

On December 11, 2014, the undersigned held a hearing on the final approval of the settlement and the motion for attorney fees.  [rec. doc. 83].  After hearing argument, the undersigned took the motions under advisement.  The Court reconvened at 1:30 p.m. to make sure that no one personally appeared to oppose the motions.  No one appeared and there has been no contact of any kind with Chambers by any potential class member or claimant.

## Law and Analysis

Rule 23 of the Federal Rules of Civil Procedure requires court approval of any settlement entered into on behalf of a certified class.  *In re Combustion, Inc*., 968 F. Supp. 1116, 1124 (W.D. La. 1997) (Haik, J).  "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).

The gravamen of an approvable proposed settlement is that it be "'fair, adequate and reasonable and is not the product of collusion between the parties.'" *In re Deepwater Horizon*, 739 F.3d 790, 820 (5th Cir. 2014), *cert. denied sub nom*. *BP Exploration & Prod. Inc. v. Lake Eugenie Land & Dev., Inc*., 135 S.Ct. 754 (2014); *Newby v. Enron Corp*., 394 F.3d 296, 301 (5th Cir. 2004) (*citing Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  When a settlement is reached as the result of arms-length negotiations between competent counsel on both sides, the settlement is presumptively valid and "ordinarily may be overcome only if its provisions are not within reasonable bounds or are illegal, unconstitutional or against public policy."  *U. S. v. Texas Education Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982).

A strong judicial policy exists favoring the resolution of disputes through settlement. *Smith v. Crystian*, 91 Fed.Appx. 952, 955 (5th Cir. 2004), *cert. denied sub nom Crystian v. Tower Loan of Mississippi Inc.*, 543 U.S. 1089,125 S.Ct. 972, 160 L.Ed.2d 898 (2005) (*citing Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982)). Therefore, a district court's approval of a settlement is given great deference and "will not be upset unless the court clearly abused its discretion." *Id*.

The application of Rule 23(e)  hinges on the analysis of six factors: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery, and (6) the opinions of the class counsel, class representatives, and absent class members. *In re Deepwater Horizon*, 739 F.3d at 820 (*citing Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)).

### Fairness, Reasonableness, and Adequacy

The undersigned has reviewed the submissions in light of the factors suggested in *Reed*, and bases the following findings on that review, the full record, and my knowledge of the case.

### *1) Existence of Fraud or Collusion*

Nothing before the Court indicates that fraud or collusion was involved in any way in the settlement of the case or in the preparation of the settlement agreement.  The undersigned has conducted numerous conferences with the parties in this case, and finds that all counsel have zealously represented their clients' interests with integrity throughout this litigation.  Based on my personal interactions, it appears that the attorneys on both sides have worked together in a professional manner to amicably resolve this case, while at the same time zealously representing the interests of their clients.

In the absence of fraud or collusion, the trial court "should be hesitant to substitute its own judgment for that of counsel." *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (*quoting Cotton*, 559 F.2d at 1330); *see also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007).  Here, there is no evidence of fraud or collusion.  Thus, this factor weighs in favor of approving the settlement.

### *2) Complexity, Expense and Duration of the Case*

Undoubtedly, this case is extremely complex.  The Amended Complaint asserts claims for securities fraud under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, which is a highly technical and specialized area of the law. As attested to in Weintraub's Declaration, counsel for Lead Plaintiff conducted a thorough

investigation into the claims asserted in the Amended Complaint, including interviews by a

private investigator with numerous former employees of LHC; reviewing and analyzing

voluminous publicly- available documents and over 137,000 pages of documents obtained from

defendants, and consulting with experts on the issues of loss causation and damages. [Weintraub

Declaration].

During two years of litigation, numerous briefs have been filed by the parties addressing

complicated issues of law.  Additionally, the Court has conducted several conferences with the

parties in Chambers, by telephone and in court.  Further, the Notice of settlement was sent to

over 54,000 potential class members, indicating that a trial of this matter would have been long

and expensive.

At the scheduling conference, the parties agreed that trial would be expected to last

approximately four weeks.  [rec. doc. 69].  Lead Plaintiff estimates that if this matter were taken

to trial, it would easily require an additional one to two years before a recovery, if any, was

obtained for the Class. [rec. doc. 79, p. 11]; *see also In re OCA, Inc. Securities & Derivative

Litigation*, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) ("[a]fter trial, the parties could still

expect years of appeals.").

For these reasons, the undersigned finds that the second factor has been met.

13

**_3) Stage of the Proceedings and Amount of Discovery Completed_**

This case was initially filed on June 13, 2012.  An Amended Complaint was filed on

November 2, 2012.  Subsequently, defendants filed a Motion to Dismiss consisting of a 34-page

brief and over 140 pages of exhibits, as well as a 16-page response.  In response, Lead Plaintiff

filed a 27-page response.  Afterwards, the Court issued a 16-page ruling denying the motion.

Defendants appealed to the Fifth Circuit, which denied the appeal.  In the interim, Lead

Plaintiff filed a Motion to Compel, which was denied by the undersigned.  Afterwards, the

undersigned held a Scheduling Conference and several status conferences.

During the course of this litigation, the parties exchanged discovery.  Lead Plaintiff

drafted Freedom of Information Act ("FOIA") requests to the Securities and Exchange

Commission ("SEC") and the Office of Inspector General, Department of Health and Human

Services, prepared the initial disclosures, and propounded requests for production of documents

upon defendants.  [Weintraub Declaration, ¶ 4].  In response, Lead Plaintiff received and

reviewed over 137,000 pages of documents produced by defendants.  [*Id*].  Additionally,

defendants propounded requests for production and interrogatories, to which Lead Plaintiff

prepared responses.  [*Id*.].

After two years of intense litigation, Lead Plaintiff filed a Motion for Preliminary

Approval of Class Action Settlement.  During the settlement negotiations, the parties prepared

detailed mediation briefs, attended a full-day mediation, and had numerous follow-up

communications with the mediator.  [*Id*].  After Judge Trimble signed the Order preliminarily

approving the settlement and providing for notice, Lead Plaintiff filed the instant Motion for

Final Approval of Settlement.

The undersigned finds that at this stage of the litigation, the parties were sufficiently able

to assess their respective positions.  Thus, the undersigned finds a sound basis to judge whether

the settlement is fair and reasonable.

### 4) Probability of Lead Plaintiff's Success on the Merits

The claims in this litigation are for violations of Sections 10(b), 20(a), and 20A of the

1934 Act and Rule 10b-5.  To prevail on its claims, Lead Plaintiff would have the burden of

proving, among other things: (1) a material misrepresentation or omission by defendants; (2)

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of

a security; (4) reliance upon the misrepresentation or omission; (5) economic loss, and (6) loss

causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317, 179 L.Ed.2d 398

(2011); *Spitzberg v. Houston American Energy Corp.*, 758 F.2d 676, 683 (5th Cir. 2014).

Lead Plaintiff acknowledges that it would have faced significant hurdles to proving

liability and damages.  [rec. doc. 79, p. 6].  Defendants have argued that they made no false

and/or misleading statements or omissions; that no evidence exists that they acted with scienter,

and that Lead Plaintiff could not prove loss causation.  [rec. doc. 31].  For example, Lead

Plaintiff concedes that even it asserted that defendants made misstatements and omissions of

material fact, defendants had "viable" defenses, including a "plausible argument" that positive

changes to certain of its business metrics were not the result of fraud, but instead stemmed from

revised business practices that reflected industry-wide changes in response to new governmental

Medicare reimbursement policies.  [rec. doc. 79 at p. 7].

Additionally, Lead Plaintiff recognizes that it would face substantial risk in proving

damages.  [*Id*.].  Defendants argued in its Motion to Dismiss that Lead Plaintiff would have

difficulty proving that the stock price drop was caused by the alleged fraud, because it could

have been  the result of other intervening causes such as market and industry factors.  [rec. doc.

31, pp. 20-21].  While Lead Plaintiff would present expert testimony regarding the damages

claim, it acknowledges that it cannot predict how a jury would weigh competing expert

testimony.

The undersigned observes that it is certainly possible that a jury could find in favor of

Lead Plaintiff.  However, the evidentiary hurdle for proving liability in a fraud case is high.  If

the jury did find liability, then it is probable that the damages, given the huge number of

potential claimants, would be substantial.

The undersigned further observes that counsel in this case are some of the most able and experienced available in this type of complicated securities fraud litigation.  For the attorneys to have concluded that a compromise rather than a jury trial was in the best of interest of their clients is a substantial factor to be considered.  *See Cotton*, 559 F.2d at 1330 ( in evaluating a settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties.").  Neither this Court, nor the parties, can possibly anticipate what a jury would actually do.  Thus, the undersigned finds that settlement is justified in this case.

### *5) Range of Possible Recovery*

To assess the reasonableness of a proposed settlement seeking monetary relief, an inquiry "should contrast settlement rewards with likely rewards if case goes to trial."  *In re Chicken Antitrust Litigation*, 669 F.2d 228, 239 (5th Cir 1982) (*citing Cotton*, 559 F.2d at 1330).  Under the proposed settlement, the Class will receive $7,850,000 plus interest in exchange for the release of all claims against defendants.  Based on preliminary damage studies prepared by Lead Plaintiff's expert on causation and damages, this equates to approximately 7.4%-10.3% of estimated provable damages.[3]  [rec. doc. 79, p. 9].

The proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial.  *In re Combustion*, 968 F.Supp. at

---

[3]     Lead Plaintiff's preliminary estimates of the Class's provable damages attributable to the alleged fraud were in the range of $76 million - $106 million.  However, this was "vigorously disputed" by defense counsel [rec. doc. 79, p. 9 n. 5].

1129. After a thorough review of Lead Plaintiff's submission, the undersigned finds that its evaluation of the range of possible recovery is reasonable. *See In re Lease Oil Antitrust Litigation*, 186 F.R.D. 403, 434, n. 47 (S.D. Texas 1999) (citing studies showing that investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud in class actions).

### 6) Opinions of Class Counsel, Class Representatives, and Absent Class Members

Lead Plaintiff and defendants favor the settlement as proposed. "Counsel are the Court's 'main source of information about the settlement,' . . . and therefore the Court will give weight to class counsel's opinion regarding the fairness of settlement." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp.2d 830, 852 (E.D. La. 2007). Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit. *Id*.

With regard to the due process requirement that an absent party be given an opportunity to be heard, the undersigned observes that copies of the Notice Packets were mailed to over 54,000 potential Class Members. Additionally, summary notices were published in *Investor's Business Daily* and *PR Newswire* and a complete set of the Settlement papers were posted on the Claims Administrator's website. Further, the Claims Administrator established a toll-free interactive voice response systems to inform potential Class Members of basic settlement information.

The attitude of absent class members, expressed either directly or indirectly by their failure to object after notice or high level of participation in the proposed settlement program, is an additional factor on which district courts generally place heavy emphasis. *Turner*, 472 F. Supp.2d at 852-53 (*citing In re Microstrategy, Inc. Sec. Litig.*, 150 F.Supp.2d 896, 905 (E.D. Va.

2001) (stating that class reaction is perhaps the most significant factor in determining whether a settlement is adequate).  In this case, the deadline for Class Members to object to the Settlement, the Plan of Allocation, or to the application for attorneys' fees and expenses was November 4, 2014, and the deadline for Class Members to exclude themselves from the Class was November 11, 2014.  As of the deadline, not one Class Member had objected to, or requested exclusion from, the Settlement.  At the hearing on the final approval of the settlement held on December 11, 2014, not one Class Member appeared and there was no contact of any kind with Chambers.

In summary, a thorough analysis of the *Reed* factors supports a finding that the settlement should be approved.

## Certification of Class

Lead Plaintiff points out that the Settlement was reached prior to a decision on class certification.  Thus, although the Court provisionally certified the Class in its Preliminary Approval Order, the undersigned, in the interest of completeness, will make a final determination of whether the Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-621 (1997).

For the purposes of settlement, Lead Plaintiff asks the Court to certify a Class consisting of all Persons who purchased or otherwise acquired LHC common stock between July 30, 2008 and October 26, 2011, inclusive.  Excluded from the Class are: (i) persons otherwise meeting the definition of the Class who submit valid and timely requests for exclusion from the Class; and

(ii) Defendants, directors and officers of LHC and their families and affiliates.  [rec. doc. 79, p.

12, n. 6].

Rule 23(a) establishes four prerequisites to class certification: (i) numerosity (ii)

commonality, (iii) typicality, and (iv) adequacy of representation.  *See id.* at 613.  In addition,

the Class must meet one of the three requirements of Rule 23(b).  See Fed. R. Civ. P. 23.

**Requirements of Rule 23(a)**

*1) Numerosity*

The first element requires that "the class is so numerous that joinder of all members is

impracticable."  Fed. R. Civ. P. 23(a)(1).  In determining numerosity, the prerequisite expressed

in Rule 23(a)(1) is "generally assumed to have been met in class action suits involving nationally

traded securities."  *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir.

1981).

During the Class Period, LHC had more than 18 million shares of common stock issued

and outstanding, which was actively traded on the NASDAQ.[4]  [rec. doc. 79, p. 13].  Lead

Plaintiff estimates that beneficial holders of LHC common stock number in the hundreds or

thousands and are geographically located throughout the United States, making joinder of all

Class Members impracticable.  [*Id*].  *See Rubenstein v. Collins*, 162 F.R.D. 534, 537 (S.D. Tex.

---

[4]Defendants do not contest the numerosity requirement.

1995) (an estimated 12 million shares traded met the numerosity requirement); *Eatmon v. Palisades Collection*, LLC, 2010 WL 1189571, *4 (E.D. Tex. March 5, 2010) (considering the "geographic dispersion of the class").  Additionally, the Notice Package was distributed to over 54,000 potential class members.  Therefore, the numerosity requirement is met.  *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding that a class of 100 to 150 members satisfies numerosity).

### *2) Commonality*

Rule 23(a)(2) is met where there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The test for commonality is not demanding and is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Mullen*, 186 F.3d at 625.

Here, the putative class members will assert claims for securities fraud.  Common questions of law and fact include: (a) whether Defendants violated the 1934 Act; (b) whether Defendants omitted and/or misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements were false and misleading; (d) whether the prices of LHC securities were artificially inflated, and (e) the extent of damage sustained by Class members and the appropriate measure of damages.  [rec. doc. 79, p. 14].

Securities fraud actions containing similar questions have been held to be candidates for

class certification. *See In re Electronic Data Systems Corp. Securities Litigation*, 226 F.R.D.

559, 564 (E.D. Tex. 2005), *aff'd*, 429 F.3d 125 (5th Cir. 2005); *In re FirstPlus Fin. Group, Inc.,*

*Securities Litigation.*, 2002 WL 31415951, at *4 (N.D. Tex. Oct. 28, 2002).  Because the core

complaint of all Class members is that they purchased or acquired LHC common stock at

artificially inflated prices, the commonality requirement of Rule 23(a)(2) is satisfied*.  See In re*

*Wireless Facilities, Inc. Sec. Litigation*, 253 F.R.D. 630, 635 (S.D. Cal. 2008) (finding "core

issue" in a securities litigation to be plaintiffs' acquisition of defendant's securities at artificially

inflated prices).

### 3) *Typicality*

In order to meet the typicality requirement, "the claims or defenses of the parties [must

be] typical of the claims or defenses of the class."  *James v. City of Dallas, Tex.*, 254 F.3d 551,

571 (5th Cir. 2011)*, abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct.

2541 (2001) (*citing Mullen*, 186 F.3d at 625).  Like commonality, the test for typicality is not

demanding.  *Mullen*, 186 F.3d at 625.  It "focuses on the similarity between the named plaintiffs'

legal and remedial theories and the theories of those whom they purport to represent."  *Id*.

(*quoting Lightbourn v. County of El Paso, Texas*, 118 F.3d at 421, 426 (5th Cir. 1997)).

Here, Lead Plaintiff's and the proposed class members' legal and remedial theories appear to be exactly the same.  The typicality requirement of Rule 23(a) is, therefore, satisfied. *See Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D. Tex. 1993).

## *4) Adequacy*

The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.  In order to satisfy the adequacy requirement, the interests of the class representatives must not be antagonistic to those of the remaining class members, and the representative parties, through their attorneys, must be prepared to prosecute the action vigorously.  *Feinberg v. Hibernia Corp.*,1992 WL 176119, *8 (E.D. La. July 14, 1992) (*citing Longden v. Sunderman*, 123 F.R.D. 547, 557 (N.D. Tex. 1988)). Numerous courts have noted that "the emphasis has been and should be placed on whether the representatives' counsel is capable." *Id*. (*citing Weinberger v. Jackson*, 102 F.R.D. 839, 844-45 (N.D. Cal. 1984)).

Here, Lead Plaintiff, as in the case with all purported Class members, purchased or otherwise acquired the common stock of LHC during the Class Period.  Therefore, there is no conflict between Lead Plaintiff and the Class it seeks to represent.

In analyzing the "vigorous prosecution" element of the adequacy requirement, courts often focus primarily on the qualifications and experience of class counsel rather than upon the

knowledge of class representatives.  *Longden*, 123 F.R.D. at 558 (*citing In re Energy Systems*

*Equipment Leasing Securities Litigation*, 642 F.Supp. 718, 751, n. 27 (E.D.N.Y. 1986)).

Here, Lead Plaintiff has retained Scott+Scott and the Lemmon Law Firm to serve as Lead and

Liaison Counsel, respectively.  Scott+Scott is highly experienced in securities class action

litigation and has successfully prosecuted many securities and other complex class actions in

courts throughout the United States. [rec. doc. 79, Declaration of Daryl F. Scott ("Scott

Declaration"), Exh. A (Scott+Scott firm resume)].  Likewise, the Lemmon Law Firm has

significant class action experience in federal and state courts throughout Louisiana.  [rec. doc.

79, Declaration of Andrew A. Lemmon ("Lemmon Declaration"), Exh. A (firm resume)].  Based

on Lead Plaintiff's counsel's performance to date, the undersigned believes that the Class

members' claims will (and have been) vigorously pursued in this litigation.

     After reviewing the Declarations of counsel and the pleadings filed in this case, the

undersigned finds that the adequacy requirement is met.

<u>**Requirements of Rule 23(b)(3)**</u>

     In addition to satisfying all of the criteria of Rule 23(a), a party seeking class certification

must also satisfy one of the requirements of Rule 23(b).  Certification of a class under Rule

23(b)(3) requires that: (1) common issues predominate over individual issues, and (2) the class

action mechanism is superior to other methods of adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

### 1) Predominance

In order to "predominate," common issues must constitute a significant part of the individual cases.  *Mullen,* 186 F.3d at 626.  The actions complained of in this case, that is, misrepresentations concerning the value of stock, involved questions of law that will affect the entire proposed class.  A finding of predominance is proper where defendants are "alleged to have acted wrongfully in the same basic manner towards an entire class."  *Eatmon v. Palisades Collection, LLC*, 2010 WL 1189571, at *8 (E. D. Texas March 5, 2010) (*quoting Randolph v. Crown Asset Management*, LLC, 254 F.R.D. 513, 519-20 (N.D. Ill. 2008).

"Efficiency is the traditional focus of the predominance test," and "[w]here significant common issues can be resolved for all claimants in a single adjudication, the advantage of a class-wide proceeding is obvious."  *Shaw v. Toshiba America Information Systems., Inc*., 91 F. Supp. 2d 942, 955 (E.D. Tex. 2000).  Predominance is, therefore, "a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Amchem*, 521 U.S. at 625.

In looking at the commonality/predominance requirement, the Fifth Circuit has held that "the key concept in determining the propriety of class action treatment is the existence or

nonexistence of material variations in the alleged misrepresentations." *Longden*, 123 F.R.D. at

553 (*quoting Grainger v. State Security Life Insurance Company*, 547 F.2d 303, 307 (5th

Cir.1977)).  Here, the same set of operative facts and the issues of falsity, materiality, scienter,

and causation are common to all Class members and predominate over any individual issues.

The commonality on these issues, which are central to defendants' liability, is sufficient to meet

the predominance test.  *See Longden*, 123 F.R.D. at 553 ("[c]ourts faced with similar fact

situations as the case at bar have held that where the complaint alleges a scheme or common

course of misconduct against a large class of purchasers allegedly defrauded over a period of

time by similar misrepresentations, class certification is appropriate, regardless of the existence

of some differences in class members' positions.").[5]

Thus, I find that the predominance factor is met.

### 2) Superiority

In determining whether the "superiority" requirement of Rule 23(b)(3) is satisfied, the

court must consider: (i) the class members' interest in individually controlling the litigation of

their own cases; (ii) the extent and nature of other litigation involving the same issues; (iii) the

---

[5]      *See also* Fed. R. Civ. P. 23, advisory committee note to 1966 Amendment ("a fraud perpetrated on numerous persons by the use of similar misrepresentations" should be appropriate for class action treatment if liability is found); *Mullen*, 186 F.3d at 626; *In re Systems Software Associates, Inc. Securities Litigation*, 2000 WL 1810085, at *4 ("[i]n a securities fraud action, any error, if there is one, should be committed in favor of allowing a class action") (citations omitted).

desirability of concentrating the litigation in this forum, and (iv) any difficulties that may be encountered in managing a class action.  Fed. R. Civ. P. 23(b)(3).

The first factor addresses class members' interests in prosecuting their own cases.  This factor "matters mainly when absent class members have personal injury claims."  *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 510 (S.D. Tex. 2004).  "When only economic losses are at issue, the interest to personally control the litigation is small.  As long as the named plaintiffs seek to maximize the recovery for the class, little else matters."  *Id.*

Here, Lead Plaintiff is plainly interested in maximizing the Class recovery, and defendants will certainly benefit from resolving all litigation in one proceeding.  [rec. doc. 79, p. 17].  Finally, because the proposed settlement allows class members to opt out, those investors who still wish to pursue individual litigation remain free to do so.  [*Id.*].

The second factor relates to the pendency of other litigation.  Other than two derivative cases that are not being settled as part of this settlement, the parties are aware of no other litigation relating to the issues addressed in this case.  [rec. doc. 79, p.  18].  Moreover, "a class action might prevent the initiation of further litigation if class members who have not filed suit could have their rights adequately determined by a representative in a class action."  *Durrett v. John Deere Co*, 150 F.R.D. 555, 559-60 (N.D. Texas 1993).  Accordingly, this factor weighs in favor of class certification.  *See Lehocky*, 220 F.R.D. at 510.

As for the third factor, desirability of concentrating litigation in this forum, Lead Plaintiff has shown a desire to focus the litigation in this Court by filing the first action in the Western District of Louisiana.  [rec. doc. 79, p. 18].  No other cases have been filed by Class members in other jurisdictions, and LHC and Myers are located in this district.  Further, the Court is familiar with the facts and legal issues of the case, having ruled on several motions.  *Lehocky*, 220 F.R.D. at 511.  The third factor, therefore, supports certification of a settlement class.

Finally, courts certifying settlement classes do not need to consider the fourth factor, which focuses on the manageability of a class action.  As the Supreme Court noted in *Amchem*, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial."  521 U.S. at 620; *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, *16 (N.D. Texas Nov. 8, 2005).  The remaining three superiority factors plainly indicate that a class action is the best vehicle for conducting this litigation.  *Schwartz* at *16.

### ***Appointment of Lead and Liaison Counsel***

Judge Trimble has already signed Orders dated September 18, 2012 [rec. doc. 29], and August 1, 2014 [rec. doc. 76], appointing Scott+Scott and the Lemmon Law Firm as Lead Counsel and Liaison Counsel, respectively [rec. doc. 29] .  Accordingly, the undersigned finds that these firms should continue representing the Class members.

## Plan of Allocation

Assessment of a plan of allocation of settlement proceeds in a class action under

Fed.R.Civ.P. Rule 23 is governed by the same standards of review applicable to the settlement as

a whole – the plan must be "fair, adequate and reasonable." *Chicken Antitrust*, 669 F.2d at 238.

An allocation formula need only have a reasonable, rational basis, particularly if recommended

by "experienced and competent" class counsel. *In re American Bank Note Holographics, Inc.*,

127 F. Supp.2d 418, 429-30 (S.D.N.Y. 2001) (*citing White v. NFL*, 822 F.Supp. 1389, 1420-24

(D.Minn.1993), *aff'd*, 41 F.3d 402 (8th Cir.1994).  "The court's principal obligation is simply to

ensure that the fund distribution is fair and reasonable." *Id*. (*quoting Walsh v. Great Atlantic &*

*Pacific Tea Co., Inc.*, 726 F.2d 956, 964 (3rd Cir. 1983)).

The district court has "broad supervisory powers over the administration of class-action

settlements to allocate the proceeds among the claiming class members  . . .  equitably." *Beecher*

*v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord*, *Chicken Antitrust*, 669 F.2d at 238.

Here, the proposed Plan of Allocation is described in the Notice of Settlement.  [rec. doc.

78, Keough Declaration, Exhibit A, pp. 4-5].  The Plan of Allocation calculates each Settlement

Member's total recognized losses and allocates the recovery based on the timing of each Class

Member's purchases and sales relative to the alleged corrective disclosures.  Under the Plan,

each Class Member will receive his or her *pro rata* share of the funds based on the calculation of

recognized losses.

In this case, the undersigned is satisfied that the plan of allocation is fair and reasonable because it appears to be rationally based on Class members' proportionate losses.  Such a "[p]ro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." *In re Sprint Corp. ERISA Litigation*, 443 F.Supp.2d 1249, 1262 (D.Kan. 2006) (*quoting  In re Global Crossing Securities & ERISA Litigation*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004).[6]

## CONCLUSION

For the foregoing reasons, the undersigned recommends that the Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds [rec. doc. 79] be **GRANTED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING**

---

[6]     To date, there have been no objections to the Plan of Allocation.

**THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

February 11, 2015, at Lafayette, Louisiana

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE